RADIO ASSOCIATION ON DEFENDING AIRWAVE RIGHTS, INC.; Frank Figuero, Petitioners,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGH-WAY ADMINISTRATION, Respondent.

No. 94–3140.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 27, 1995.

Decided Feb. 17, 1995.

Steven P. Resnick (argued and briefed), Annapolis, MD, and David B. Sloan, O'Hara, Ruberg & Taylor, Covington, KY, for petitioners.

Katherine S. Gruenheck (argued and briefed), and Robert V. Zener, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, DC, for respondent.

K. Michael O'Connell (briefed), Collier, Shannon, Rill & Scott, Washington, DC, W. Gary Blackburn (briefed), Blackburn & Slobey, Nashville, TN, Kenneth E. Siegel (briefed), Alexandria, VA, Michele M. Fields (briefed), Ins. Institute for Highway Safety, Arlington, VA, and Henry M. Jasny (briefed), Washington, DC, for amici curiae.

Before: JONES and MILBURN, Circuit Judges; and COHN,* District Judge.

MILBURN, Circuit Judge.

Petitioners Radio Association on Defending Airwave Rights, Inc. (RADAR) and Frank Figuero, a commercial motor vehicle operator, petition this Court to review, enjoin, and set aside a regulation of the Federal Highway Administration prohibiting the use of radar detectors in commercial motor vehicles. On petition for review, the issues are: (1) whether the agency arbitrarily and capriciously promulgated the rulemaking, based on evidence in the administrative record, (2) whether the agency failed to adequately conduct a cost assessment of the rulemaking, (3) whether the agency was improperly influenced by Congressional pressure in rendering its decision to promulgate the rulemaking, and (4) whether the rulemaking violates equal protection guarantees of the Fifth Amendment to the Constitution of the United States by prohibiting only the use of radar detectors in commercial motor vehicles while leaving other vehicles unregulated. For the reasons that follow, the petition for review is denied.

## I.

A. Regulatory Authority of the Federal Highway Administration

Congress first authorized federal regulation of motor carrier vehicles in the Motor Carrier Act of 1935, ch. 498, Part II, § 204(a), 49 Stat. 543, 546–47 ("the 1935 Act"). Subsequently, Congress enacted the Motor Carrier Safety Act of 1984, which ratified the regulations adopted under the authority of the 1935 Act and required the Secretary of Transportation ("the Secretary") to issue updated or more stringent rules. Motor Carrier Safety Act of 1984, Pub.L. 98–544, 98 Stat. 2832 (1984) ("1984

Safety Act").[1] The express purpose of the 1984 Safety Act was "to promote the safe operation of commercial motor vehicles ... and to assure increased compliance with traffic laws and with the commercial motor vehicle safety and health rules, regulations, standards, and orders issued pursuant to this Act." 49 U.S.C. App. § 2501.

In the 1984 Safety Act, Congress made the following findings:

(1) it is in the public interest to enhance commercial motor vehicle safety and thereby to reduce highway fatalities, injuries, and property damage;

(2) improved, more uniform commercial motor vehicle safety measures and strengthened enforcement would reduce the number of fatalities and injuries and the level of property damage related to commercial motor vehicle operations;

(3) enhanced protection of the health of commercial motor vehicle operators is in the public interest; and

(4) interested State governments can provide valuable assistance to the Federal Government in assuring that commercial motor vehicle operations are conducted safely and healthfully.

49 U.S.C. App. § 2502.[2] Based on these findings, Congress authorized the Secretary to issue or reissue regulations pertaining to the safe operation of trucks including minimum standards to "ensure that ... commercial motor vehicles are safely ... operated." 49 U.S.C. App. § 2505(a)(1). The Secretary also has the authority to "prescribe requirements for ... safety of operation ... of motor carrier[s]" under the Motor Carrier Act of 1935, as amended, 49 U.S.C. § 3102(b). Regulatory authority under both statutes has been delegated to respondent, the Federal Highway Administration ("FHWA" or "the agency"). 49 U.S.C. § 104(c)(2); 49 C.F.R. 1.48(f), (aa).

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The 1984 Safety Act was recodified at 49 U.S.C. § 31,131 et seq. by Pub.L. No. 103–272 on July 5, 1994. 49 U.S.C. § 3102(b) of the 1935 Act, as amended, was also recodified by Pub.L. No. 103–272 at 49 U.S.C. § 31,502(b).

2. Under the 1984 Safety Act, a commercial motor vehicle ("CMV") is defined as any vehicle with a gross vehicle weight rating in excess of 10,000 lbs., a bus capable of carrying 16 or more passengers, and vehicles carrying hazardous cargo in quantities requiring placarding. 49 U.S.C. App. § 2503(1).

## B. Regulation of Radar Detectors

Radar detectors have been the subject of a great amount of controversy and proposed legislation.[3] In May 1988, a group of safety organizations, police agencies, and representatives of the insurance industry jointly filed a petition for rulemaking to ban the use of radar detectors in CMVs with the FHWA. The agency denied the petition on November 8, 1988, stating:

It is our view that the enforcement of speed limit laws on the highways is a problem which is common to the States and not truly national in scope. As a common state problem, we believe that the States, acting either individually or together, can effectively deal with this matter.

November 8, 1988 letter from FHWA to group petitioning for rulemaking (quoted in Petitioners' Brief at 5). Thus, the agency concluded that a federal ban on radar detectors would violate principles of federalism. *Id.*

On July 18, 1990, a second petition was filed with the FHWA seeking a rulemaking to prohibit radar detectors in CMVs. The petition was filed jointly by Advocates for Highway and Auto Safety, the American Automobile Association, the American Trucking Association, the Insurance Institute for Highway Safety, the International Association of Chiefs of Police, the National Association of Governors' Highway Safety Representatives, the National Safety Council, and Public Citizen. The petition cited studies that showed: (1) drivers of tractor-trailers were the most likely to use radar detectors, (2) drivers of tractor/semitrailers with radar detectors were two to three times more likely to speed than those without radar detectors, and (3) technology is now available to law enforcement authorities to detect the use of radar detectors.

Respondent FHWA had taken no action on the petition for rulemaking when Congress enacted the DOT Appropriations Act of 1992. This Act directed the Secretary to publish

a notice of proposed rulemaking with regard to amending the Federal Motor Carrier Safety regulations to prohibit the use of radar detectors in operating commercial motor vehicles. Such notice shall solicit testimony regarding the safety, economic, and operational aspects of prohibiting radar detectors in commercial operations.

DOT Appropriations Act of 1992, Pub.L. No. 102–143, § 342 (1991). Accordingly, on January 24, 1992, FHWA published a notice of proposed rulemaking ("NPRM") to comply with the Congressional mandate to conduct a rulemaking proceeding and to respond to the 1990 petition for a rulemaking. 57 Fed.Reg. 2885 (1992). In the NPRM, the agency acknowledged that the public held "widely divergent views on the rationale for, and efficacy of, banning radar detectors from CMVs," and that "scientific proof establishing a direct causative linkage between radar detector use and CMV accidents may not exist." *Id.* Furthermore, the agency stated in the NPRM that although it denied a similar petition in 1988 on grounds of federalism, the agency has the statutory authority to promulgate such a regulation. Specifically, the agency stated that while it continued to believe that enforcement of speed limit laws was better left to the states, the

authority for the proposed ban on radar detector use and possession under 49 CFR part 392 is inherent in the broad, longstanding powers conferred on the Secretary to regulate the *safety* on [sic] interstate motor carriers of passengers and property under Title 49 of the United States Code. In particular, the Motor Carrier Safety Act of 1984 (1984 Act) (Pub.L. 98–554, 98 Stat. 2832) provides ample authority for this proposed rulemaking. In addition, Public Law 102–143 specifically directs the Department of Transportation to issue this proposal. The Senate Committee report on Public Law 102–

---

**3.** As petitioners note in their brief, Congress has repeatedly refused to enact bills prohibiting the use of radar detectors generally or to provide penalties for their manufacture, sale and use. *See, e.g.,* S. 1418, 103rd Cong., 1st Sess. (1993); H.R. 881, 102nd Cong., 1st Sess. (1991); H.R.

224, 101st Cong., 1st Sess. (1989); H.R. 2102, 101st Cong., 1st Sess. (1989). In addition, only three states currently ban radar detectors while forty states that have considered radar detector bans have rejected them. Petitioners' brief at 4.

143 stated that, "while the general prohibition of radar detectors is properly left to the States, the use of radar detectors in vehicles in interstate commerce is an appropriate arena for the Federal Government to regulate." [4]

*Id.* at 2887 (Emphasis added). However, the agency requested comments on whether a decision to ban radar detectors is more appropriately left to the states. *Id.*

In addition, FHWA prepared a Preliminary Regulatory Evaluation of the proposed ban which summarized data relating to the correlation between radar detector use and speeding, and between speeding and accidents. The preliminary evaluation concluded that no direct link between radar detectors and CMV accidents had been proven at that time nor had a clear relationship between radar detector bans and enhanced CMV safety been established. Thus, the agency determined that a chain of inference was required to assess the effects of radar detector use on highway safety. The agency described the chain as follows:

(a) Radar detectors lead to an increased incidence of speeding;

(b) More speeding results in more accidents, and in accidents of greater severity.

*Id.* The agency also noted that evidence exists to show that radar detector users have a higher propensity to speed than nonusers. Finally, the agency stated that traffic engineering literature was not clear as to whether speeding causes accidents. While some studies suggest that increased speed alone leads to more accidents, other studies indicate that variance in speed relates more directly to accident incidence than does speeding per se. However, the agency also noted that the literature indicates that once a crash occurs, injury severity increases as speed increases. *Id.*

FHWA received 26,454 comments in response to the NPRM.[5] These comments reflected widely divergent views on the desirability of the proposed ban. Comments in support of the ban were received from 24 state transportation and motor vehicle departments, 442 police agencies, 50 safety interest groups, several trucking and motorcoach associations, the insurance industry, commercial and public interest organizations specializing in highway safety matters, health professionals, and the general public. These comments stated that the only use of radar detectors is to violate the speed limit laws without detection; that drivers are more likely to speed when using a radar detector; that police agencies have the technology to enforce a radar detector ban; that a positive correlation exists between radar detector use and speeding, and between speeding and accidents; and that the larger weight of CMVs causes greater severity of accidents when these vehicles are involved in accidents while speeding.

Comments were also received from CMV operators and the radar detector industry in opposition to the proposed ban. These comments stated that radar detectors are necessary to protect drivers from faulty police speed detection devices; that a federal radar ban would infringe upon states' rights; and that a radar detector ban would impermissibly restrict CMV operators' liberty. In addition, petitioner RADAR included with its comment an independent evaluation of the statistical justification of the proposed regulation conducted by the Texas Research and Development Foundation ("TRDF"). The TRDF study concluded that the proposed ban would not increase highway safety because no evidence reflected a correlation between radar detector use and the occurrence or severity of CMV accidents. The TRDF study concluded that speed variance was the cause of most accidents.

In April 1993, FHWA testified before Congress that the agency was unable to establish a direct link between radar detector use and CMV accidents, nor could it establish a clear relationship between radar detector bans already in effect and enhanced CMV safety. Nevertheless, in August 1993, the agency prepared its "Regulatory Evaluation to Accompany Final Rule: Radar Detectors in Commercial Motor Vehicles." This regulato-

---

4. Senate Report Number 102–148, 102d Congress First Session, page 90 (1991).

5. The comment period closed May 26, 1992.

ry evaluation concluded that radar detector regulation will lead to a reduction in speed, which will lead to a reduction in the severity of accidents. Thus, the regulatory evaluation found that the agency should promulgate the rulemaking. The agency had still not taken any action on the rulemaking when the Senate Appropriations Committee Report was published in September 1993. In that report, the Committee stated:

The FHWA has indicated that there is inadequate information on the role of radar detectors in crashes involving commercial motor vehicles. Although accident causation is difficult to determine, it would be worthwhile to obtain quantitative data to determine whether commercial motor vehicles with radar detectors are overrepresented in crashes that involve speeding by operators of commercial motor vehicles. To this end, the Committee directs the FHWA ... to conduct a study indicating the presence, or lack thereof, of radar detectors in commercial vehicles involved in crashes in which commercial vehicles were believed to have been or were charged with exceeding the posted speed limit. Also, FHWA should also determine the presence, or lack thereof, of radar detectors in the population of commercial motor vehicles. A comparison of these two proportions should be used to determine whether commercial motor vehicles with radar detectors are overrepresented in crashes that involve speeding.

. . . . .

The Committee is displeased that the FHWA has not moved forward with the rulemaking that would ban radar detectors in commercial motor vehicles. The Com-

mittee directs that the Administrator and the Associate Administrator inform the Committee as soon as possible on the future direction that the Agency will pursue regarding this matter.

Senate Appropriations Committee Report, S.Rep. No. 150, 103d Cong., 1st Sess. 111–12 (1993). The agency subsequently forwarded its proposed rule to the OMB on October 8, 1993 without conducting any further studies regarding the correlation between radar detector use in CMVs and traffic safety.

On December 14, 1993, FHWA issued a final rule amending 49 C.F.R. Parts 390 and 392 to ban the use of radar detectors in CMVs.[6] In the final rule, FHWA acknowledged that various groups hold widely divergent views on the rationale of banning the use of radar detectors in CMVs and that unequivocal scientific proof establishing a direct causative linkage between radar detector use and CMV accidents may not exist. Nevertheless, FHWA determined that "sufficient safety rationale and justification exist to support banning the use of radar detectors in CMVs ..." J.A. 9. The agency based this conclusion on the information contained in the 1990 petition for rulemaking and the comments received in response to the NPRM.

The agency explained its reasoning for the final rule in its final regulatory evaluation which summarized data on the relationships between radar detector use and speeding, and between speeding and accident severity. FHWA predicted that the rule will result in a reduction in the speed of trucks which will lead to a decline in the severity of accidents. The agency further explained that for this

---

**6.** The rule added the following section to Part 392—Driving of Motor Vehicles:

§ 392.71 Radar detectors; use and/or possession.

(a) No driver shall use a radar detector in a commercial motor vehicle, or operate a commercial motor vehicle that is equipped with or contains any radar detector.

(b) No motor carrier shall require or permit a driver to violate paragraph (a) of this section. The rule also added the following definition to § 390.5:

*Radar detector* means any device or mechanism to detect the emission of radio microwaves, laser beams or any other future speed measurement

technology employed by enforcement personnel to measure the speed of commercial motor vehicles upon public roads and highways for enforcement purposes. Excluded from this definition are radar detection devices that meet both of the following requirements:

(1) Transported outside the driver's compartment of the vehicle. For this purpose, the *driver's compartment* of a passenger-carrying CMV shall include all space designed to accommodate both the driver and the passengers; and

(2) Completely inaccessible to, inoperable by, and imperceptible to the driver while operating the vehicle.

J.A. 6–7.

result to transpire, the following conditions must be true.

(1) Some truck drivers must be using radar detectors.

(2) These drivers must be travelling at higher speeds than drivers without radar detectors.

(3) These truck drivers must be in more severe accidents than trucks that are not speeding.

(4) The ban must cause a reduction in detector use.

(5) The reduction in detector use must lead to a decline in truck speeds.

(6) This reduction in speeds must result in a reduction of the severity of accidents.

J.A. 66. The agency cited studies which supported these presumptions.

Based on this logic, FHWA performed a cost-benefit analysis of the regulation.[7] The agency found that the primary benefit of the rule is a reduction in the severity of accidents. Thus, FHWA assumed that every injury that results from an accident involving a heavy vehicle with a radar detector, and in which speed is a factor, becomes less severe by one level of the Maximum Adjusted Injury Scale ("MAIS"), a coding scheme of the cost of accidents. Moreover, the agency assumed that one third of all fatalities will instead be incapacitating injuries. However, the agency did not assume the ban would result in a net reduction of accidents. In order to calculate the projected benefits of the regulation, the agency multiplied the number of CMV accidents in 1990 by an estimate of the percentage of these accidents in which speeding was a contributing factor. The agency then estimated the percentage of these accidents in which a radar detector was used. Finally, the agency reduced this total by one MAIS level and found that the ban would yield a benefit of $68 million.

The agency determined that the cost of the ban is difficult to determine. The agency noted that manufacturers of radar detectors

and some distributors would be negatively effected by the ban. The agency rejected petitioner RADAR's estimate of these costs finding that the ban does not prohibit the production of radar detectors, and manufacturers could continue to sell their products to automobile drivers and to export markets. Further, the agency found that the CMV market for radar detectors is dwarfed by the passenger car market for these devices. In addition, the agency concluded that radar detector manufacturers should have increased sales of radar detector detectors needed to enforce the ban. Therefore, the agency concluded that the benefits of the rule were 4.5 times greater than its costs.[8]

Finally, the agency analyzed the effects of the rule on the policy-making discretion of the states. FHWA concluded that "Consistent with federalism principles, the final rule provides for a Federal ban, but provides significant discretion for States in their enforcement." J.A. 28. The agency also acknowledged that the Senate Appropriations Committee directed FHWA to study the effects of radar detector use by CMVs on highway safety. In response, the agency stated that it "intends to carefully monitor the effects of the radar detector ban on CMV operations and safety." J.A. 9. This timely petition for review followed.

## II.

### A.

Petitioners argue that FWHA's rulemaking, which prohibits the use of radar detectors in CMVs, is arbitrary and capricious. The Administrative Procedure Act ("APA") sets the standard of review applied in cases of appeals from agency rulemaking. When reviewing a rulemaking, "We must uphold a rule unless it exceeds the authority vested in the agency by Congress or is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....'" *National*

---

7. Both the Motor Carrier Safety Act of 1935, as amended, and the 1984 Safety Act require the agency to conduct a cost/benefit analysis prior to adoption of a rule. 49 U.S.C. § 3102(d); 49 U.S.C. App. § 2505(c)(2).

8. The agency also noted that unmeasured costs and benefits of the rule included a possible increase in the price of radar detectors for passenger cars and a reduction in fuel use as CMV speeds are reduced, respectively.

*Truck Equip. Ass'n v. National Highway Traffic Safety Admin.,* 919 F.2d 1148, 1152–53 (6th Cir.1990) (quoting 5 U.S.C. § 706(2)(A) (1988)). "In determining whether a decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law the reviewing court must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Simms v. National Highway Traffic Safety Admin.,* 45 F.3d 999, 1003 (6th Cir.1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). The Supreme Court has explained that the

> scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). This court has cautioned that "Given the narrow scope of review permitted when a petitioner claims standards adopted by an agency are arbitrary and capricious, a reviewing court must take care not to merely rubber stamp agency decisions. Rather the court must 'ensure that the agency took a "hard look" at all relevant issues and considered reasonable alternatives....'" *Simms,* 45 F.3d at 1004 (quoting *Neighborhood TV Co. v. Federal Communications Comm'n,* 742 F.2d 629, 639 (D.C.Cir.1984)).

Petitioners argue that the rulemaking is arbitrary and capricious for several reasons.

Petitioners assert that the agency failed to make any showing that radar detectors cause or increase the risk of accidents involving CMVs; the agency failed to evaluate the effect of the rule on speed distribution in the overall traffic stream; the agency did not address the efficacy of the rule in light of CMV crash data regarding heavy trucks; the agency failed to show the rule's efficacy in light of evidence that state radar detector bans have not decreased radar detector usage; and the agency reversed its position on the appropriateness of a federal ban without explanation.

■ First, petitioners argue that the rulemaking exceeds its statutory authority because the agency did not find, or render any professional judgment, that radar detector use causes or contributes to the occurrence of CMV accidents. Specifically, petitioners assert that the 1984 Safety Act requires the agency to minimize "unnecessary pre-emption" of state laws. 49 U.S.C. App. § 2505(c)(2). Thus, petitioners argue that the agency's failure to make the threshold determination of whether detector use causes or contributes to CMV accidents causes the rule to exceed the agency's statutory authority. Petitioners cite *Industrial Union Dep't, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 613–15, 100 S.Ct. 2844, 2849–50, 65 L.Ed.2d 1010 (1980), for the proposition that the failure to make a factual determination that a rule is reasonably necessary causes the agency action to exceed its statutory authority.

■ In this case, FHWA promulgated the rulemaking at issue to bring CMV operators into compliance with States' posted speed limits and thereby minimize injuries when highway collisions occur. Radar Detectors in Commercial Motor Vehicles, 58 Fed.Reg. 67370, 67371 (1993). FHWA has been granted very broad authority to promulgate regulations to ensure, among other things, that CMVs are safely operated. *See* 49 U.S.C. § 3102(b), 49 U.S.C. App. § 2505(a)(1). Moreover, the express purpose of the 1984 Safety Act is to "minimize dangers to the health of operators of commercial motor vehicles" and "to assure increased compliance with traffic laws." 49 U.S.C.

App. § 2501. FHWA's rulemaking authority is not limited to measures that affect the occurrence of accidents, as petitioners argue. We find no support for petitioners' assumption that accident causation must be linked to radar detector use before FHWA could promulgate the rulemaking.[9]

Moreover, the administrative record shows that it was reasonable for the agency to conclude that a ban of radar detectors in CMVs would increase traffic safety. FHWA determined that radar detector users are more likely to speed than nonusers. In addition, the agency found that once a crash occurs, the severity of the accident increases as crash speed increases. Further, studies indicated that CMV operators were two to three times more likely to use radar detectors than other vehicle operators and that operators with these devices are more likely to speed than those without radar detectors. Therefore, we conclude that the agency did not exceed its statutory authority in promulgating the rulemaking without finding that radar detector use causes or contributes to the occurrence of CMV accidents.

■ Second, petitioners argue that the rule is arbitrary and capricious because it fails to assess the impact on traffic safety of banning radar detector use in only one class of vehicles, i.e., CMVs, while leaving passenger and other vehicles unregulated. Petitioners assert that variance of traffic speed is the main cause of traffic accidents. Thus, by only banning radar detector use in CMVs, the rule will increase the disparity in the variance of traffic speed because unregulated cars will arguably still exceed the speed limit while CMVs will not speed without radar detectors. Petitioners conclude that by failing to study this dynamic, the agency has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

The agency argues that the rule is based on the premise that state speed limits constitute maximum safe speeds and that the ban would induce CMV operators to comply with those limits.[10] Furthermore, in its preliminary regulatory evaluation, the agency noted that while some traffic engineering studies indicate that variance in speed relates more directly to accident incidence than does speeding per se, other studies suggest that increased speed alone leads to more accidents. Thus, the effect of speed variance of the traffic stream is not clear. Therefore, we will not hold that the agency acted arbitrarily or capriciously in failing to monitor this effect. Moreover, the agency found that it was clear that once a crash occurs, injury severity increases as crash speed increases and thus, a reduction in speed causes a reduction in injury severity. Therefore, we conclude that the agency did not fail to consider an important aspect of the problem.

■ Third, petitioners argue that the rule is arbitrary and capricious because the agency failed to consider the efficacy of the rule in light of CMV crash data regarding heavy trucks. Specifically, petitioners argue that there is no evidence on the record that CMV operators speed because they operate radar detectors. Instead, petitioners assert that the record shows that some CMV drivers slow down when they receive a signal thus having a positive effect on traffic safety. Moreover, petitioners assert that the occurrence of accidents is extremely low in heavy trucks, where detector use is the highest and, therefore, radar detectors do not cause these users to be involved in more accidents. In addition, petitioners assert that radar detectors increase traffic safety by assisting CMV drivers to drive at the mean speed of traffic. Based on these arguments, petitioners assert that the agency did not consider all "relevant factors" and "relevant data" presented by the

---

9. Petitioners argue that "the regulation also exceeds statutory authority, in that radar detectors, which are not part of safety or other CMV equipment, are not within the scope of regulatory authority given to FHWA by [the 1984 Safety Act]." Petitioners' brief at 25 n. 8. However, the rule at issue is a safety "operation" standard for CMVs, which is expressly authorized by the

1984 Safety Act. *See* 49 U.S.C. App. § 2505(a)(1).

10. The agency also argues that its regulatory authority under the 1984 Safety Act is limited to CMVs only and thus it was proper for the ban to apply only to CMVs.

record. *State Farm*, 463 U.S. at 42–43, 103 S.Ct. at 2866–67.

The agency addressed petitioners' concerns in its regulatory evaluation of the final rule. The agency found that

> several studies document that drivers with radar detectors are more likely to speed than those without radar detectors, and they are likely to speed faster than non-radar equipped drivers. [The] ... 7 State IIHS [Insurance Institute of Highway Safety] study showed that 28 percent of trucks with radar detectors were travelling faster than 65 MPH, while only 18% of trucks without [radar] detectors were travelling that fast. Six percent of detector equipped trucks were driving over 70 MPH, while only 3% of those without [radar] detectors were moving that fast. Another 1990 study by IIHS of radar detector use in Maryland and Virginia found similar results (Radar Detector Use and Speeds in Maryland and Virginia). That study reported that 35% of tractor trailers with radar detectors were travelling over 65 MPH, while only 15% of those without radar detectors were travelling that fast. For speeds over 70 MPH, the comparable numbers are 7% and 2%, respectively.

J.A. 67. Thus, the administrative record supports the agency's finding that CMV operators with radar detectors are more likely to speed than non-users.[11]

Further, petitioners' argument that no evidence shows that the use of radar detectors causes CMV operators to be involved in more accidents is not relevant. As discussed above, the rulemaking is based on the presumption that radar detectors cause speeding, and speeding increases the severity of accidents when they occur. The rule does not purport to show a connection between radar detector use and accident occurrence. Finally, we find no merit in petitioners' argument that radar detectors increase traffic safety by assisting CMV operators to drive at the mean speed of traffic. The agency concluded that posted State speed limits are the maximum safe speed. Moreover, the agency presented evidence that accident severity increases as speed increases. Therefore, we conclude that the agency considered all relevant evidence presented by the record in its rulemaking process.

 Fourth, petitioners argue that the agency failed to show the rule's efficacy in light of evidence that state radar detector bans have not decreased radar detector use. An agency rule is arbitrary and capricious if an agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

In this case, the agency found that "One IIHS study showed that trucks in Virginia, where radar detectors are illegal, are more likely to possess [radar] detectors than are trucks in Maryland, where detectors are not illegal ... This suggests that there may be problems enforcing the ban." J.A. 68. However, the agency also found that a later study of states with radar detector bans showed a slight reduction in their use in those states. Finally, the agency stated that "We believe that the differences between State bans and a nationwide ban are differences of kind, not of degree." J.A. 68. The agency found that "Drivers with [radar] detectors now may be disinclined to remove them when travelling through the few States where they are illegal, as they can be used in the remaining 47 States." *Id.* We find that this explanation is not "so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. Accordingly, we conclude that the rule is not arbitrary and capricious.

 Finally, petitioners argue that the rulemaking is arbitrary and capricious because the agency reversed, without explanation, its repeated professional judgment that no rule banning radar detectors should issue. In *State Farm*, the Supreme Court held that " 'An agency's view of what is in the public

---

11. We note that petitioners argue above that banning the use of radar detectors in CMVs only would be unsafe because it would create a greater speed variance between regulated vehicles, i.e., CMVs, and unregulated vehicles. This argument contradicts petitioners' assertion that CMV operators with radar detectors are not more likely to speed than non-users.

interest may change, either with or without a change in circumstances. But an agency ... must supply a reasoned analysis ...'" *State Farm*, 463 U.S. at 57, 103 S.Ct. at 2874 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)).

The agency explains that its previous reluctance to issue a rulemaking banning the use of radar detectors in CMVs was based on federalism concerns. The agency further argues that its belief that it needed evidence linking radar detector use to accident occurrence to promulgate the rulemaking was not based on doubts as to the positive safety effects of the ban, but on federalism grounds. Moreover, the agency argues that the comments received in response to the NPRM persuaded the agency that the safety problem presented by CMVs using radar detectors was national in scope and thus overcame the agency's previous federalism concerns. In the NPRM, the agency stated that "If safety justification [for banning radar detectors] is established, the FHWA must also decide whether a decision to ban such equipment is more appropriate for individual States to make, and specifically seeks comments on this issue." 57 Fed.Reg. 2887 (1992). Moreover, in the preamble to its final rule, the agency concluded that "Based on comments received to the docket, ... the FHWA believes that sufficient safety rationale and justification exist to support banning the use of radar detectors in CMVs ..." Radar Detectors in Commercial Motor Vehicles, 58 Fed.Reg. 67370, 67371 (1993). Therefore, we conclude that the agency properly changed its view of its federalism concern regarding the ban based on a fuller understanding of the national scope of the safety issue presented by CMV use of radar

detectors through comments received in the rulemaking process. Accordingly, we hold that the rule is not arbitrary and capricious.

**B.**

■ Petitioners argue that the rulemaking must be set aside because the agency failed to properly conduct a cost assessment of the proposed rule as required by 49 U.S.C. § 3102(d). Both the Motor Carrier Safety Act of 1935, as amended, and the 1984 Safety Act require the agency to conduct a cost-benefit analysis prior to adoption of a rule.[12] 49 U.S.C. § 3102(d); 49 U.S.C. App. § 2505(c)(2). The agency included this analysis in its regulatory evaluation of its final rule. While petitioners concede that the agency did perform a cost assessment, they argue that the assessment is incomplete, without a factual basis, and in violation of the law. Petitioners put forth two reasons why the cost assessment is allegedly inadequate. First, petitioners argue that the cost assessment is incomplete because it fails to consider the costs that the states will incur in enforcing the ban. Second, petitioners argue that the cost analysis is flawed because it provides no factual basis for the number of accidents in which the radar detector ban will affect by reducing the number of fatalities and the severity of injuries. In addition, petitioners argue that the cost analysis does not provide an adequate factual basis for its assumption that a radar detector ban will reduce the severity of injuries in accidents involving CMVs.

Thus, we must determine if the cost assessment performed by the agency was arbitrary and capricious. *See Center for Auto Safety v. Peck*, 751 F.2d 1336, 1366 (D.C.Cir. 1985). The legislative history of the 1984 Safety Act, which established a cost-benefit

---

**12.** As discussed earlier, the 1984 Safety Act gave the agency the authority to reissue regulations pertaining to truck safety. 49 U.S.C. App. § 2505(a)(1). The agency must conduct a cost-benefit analysis under this section pursuant to 49 U.S.C. App. § 2505(c)(2), which states in relevant part:

Before issuing such regulations, the Secretary shall, *to the extent practicable* and consistent with the purposes of this Act, consider (A) costs and benefits ... (Emphasis added).

The 1935 Act, as amended, also gave the agency the authority to regulate truck safety. 49 U.S.C § 3102(b). The 1984 Safety Act added 49 U.S.C. § 3102(d), which also required the agency to conduct a cost-benefit analysis, stating:

Before prescribing or revising any requirement under this section, the Secretary shall consider the costs and benefits of such requirement.

analysis requirement under both the 1984 Safety Act, 49 U.S.C. App. § 2505(c)(2), and the 1935 Act, 49 U.S.C. § 3102(d), explains the purpose of this analysis as follows:

> In requiring the Secretary to consider costs and benefits, where practicable, in the course of regulatory activities, the Committee realizes that many aspects of safety and health regulation do not lend themselves to detailed cost-benefit analysis. However, the Committee intends that DOT, in issuing a regulation, will perform *some type* of cost-benefit analysis, recognizing that while the benefits of a particular rule or regulation may be substantial, they may not be quantifiable. *Additionally, the Committee does not intend such requirement to have the effect of precluding, preventing, or suspending the promulgation or revision of rules, regulations, standards, or orders due to difficulty in establishing specific, quantified cost or benefit data.*

S.Rep. No. 98–554, 98th Cong., 2d Sess. 8 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4769, 4792. (Emphasis added).

The agency argues that it was under no obligation to include the cost of enforcement the states will incur in its cost analysis of the ban. The agency bases this argument on the premise that until a state adopts the Federal ban, it has no enforcement obligation. The agency also argues that some states already possess radar detector detectors. Finally, the agency notes that states may use federal grant money they receive for enforcement of highway safety pursuant to the 1984 Safety Act to enforce the ban. The agency clearly performed "some type" of cost-benefit analysis. Based on the significant discretion the states have to enforce the ban, we hold that the agency's failure to estimate the cost of enforcement does not render the rulemaking arbitrary and capricious.

Petitioners also argue that the cost assessment is flawed. Petitioners first argue that the cost assessment is flawed because the agency did not provide any bases for determining the relevant number of accidents involving speeding and radar detectors which the ban will purportedly affect. However, in its regulatory evaluation, FHWA explained how it calculated this number. In order to calculate the relevant number of accidents the ban will affect, the agency multiplied the number of CMV accidents in 1990, as reported by the National Highway Traffic Safety Administration ("NHTSA"), by an estimate of the percentage of these accidents in which speeding was a contributing factor, as determined by NHTSA's Summary of Medium and Heavy Truck Crashes in 1990. The agency then estimated the percentage of these accidents in which a radar detector was used relying on two IIHS studies. We conclude that this analysis satisfies the statutory cost assessment requirement and is not arbitrary and capricious.

Finally, petitioners argue that the cost assessment is flawed because it does not provide a basis for its assumption that the ban would cause all relevant injuries to be reduced by one Maximum Adjusted Injury Scale ("MAIS") level. The agency presented evidence that a radar detector ban would result in a reduction in speed, which would result in a lesser degree of injury when those vehicles are involved in accidents. While the agency did not present any evidence to support its assumption that the ban would result in a one MAIS level reduction in the severity of accidents, we find that this "difficulty in establishing specific, quantified cost or benefit data" should not render the rulemaking arbitrary and capricious. S.Rep. No. 98–554, 98th Cong., 2d Sess. 8 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4792. Accordingly, we hold that the agency conducted a cost-benefit assessment of the rulemaking, and its assessment was not arbitrary and capricious.

### C.

▮▮▮ Petitioners argue that the agency's rulemaking must be stricken because the agency was improperly influenced by Congressional pressure thus rendering the rulemaking arbitrary and capricious. Petitioners argue that in 1988, FHWA rendered its professional judgment that, based on the information available, no rulemaking should be undertaken because of the lack of scientific evidence establishing a correlation between radar detector use and traffic safety. Petitioners further assert that FHWA changed

its position because of political pressure from Congress ordering the agency to adopt a ban on radar detectors in CMVs. Specifically, petitioners point to two instances of alleged Congressional pressure. First, petitioners argue that Congress ordered the agency to promulgate such a rulemaking by stating in a rider in the 1992 DOT Appropriations Act:

> The Secretary of Transportation shall publish by January 15, 1992, a notice of proposed rulemaking with regard to amending the Federal Motor Carrier Safety regulations to prohibit the use of radar detectors in operating commercial motor vehicles. Such notice shall solicit testimony regarding the safety, economic, and operational aspects of prohibiting radar detectors in commercial operations.

Pub.L. No. 102–143, § 342 (Oct. 28, 1991). Second, petitioners allude to "pressure subsequently applied by the senate committee which controlled [the agency's] budget." Petitioner's Brief at 30. In 1993, the Senate Appropriations Committee noted that "FHWA has indicated that there is inadequate information on the role of radar detectors in crashes involving commercial motor vehicles." Senate Appropriations Committee Report, S.Rep. No. 150, 103d Cong., 1st Sess. 111–12 (1993). In this connection, the Committee directed the agency to conduct a study of the correlation between radar detector use in CMVs and traffic safety. The Committee further stated that it was "displeased that the FHWA has not moved forward with the rulemaking that would ban radar detectors in commercial motor vehicles. The Committee directs that the Administrator and the Associate Administrator inform the Committee as soon as possible on the future direction that the Agency will pursue regarding this matter." Senate Appropriations Committee Report, S.Rep. No. 150, 103d Cong., 1st Sess. 111–12 (1993).

■ Before an administrative rulemaking may be overturned on the grounds of Congressional pressure, two conditions must be met. "First, the content of the pressure upon the Secretary [must be] designed to force him to decide upon factors not made relevant by Congress in the applicable statute. . . . Second, the Secretary's determina-

tion must be affected by those extraneous considerations." *Sierra Club v. Costle,* 657 F.2d 298, 409 (D.C.Cir.1981) (citing *D.C. Fed'n of Civic Ass'ns v. Volpe,* 459 F.2d 1231 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972)); *Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs,* 714 F.2d 163, 169–70 (D.C.Cir.1983); *Town of Orangetown v. Ruckelshaus,* 740 F.2d 185, 188 (2d Cir.1984); *Citizens Comm. Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 579 (S.D.Ohio 1982).

Thus, we must determine whether the Congressional remarks regarding a ban of radar detector use in CMVs were designed to force the agency to consider factors not made relevant by Congress in the 1984 Safety Act when determining whether to promulgate the rulemaking. First, we conclude that petitioners incorrectly describe the Congressional rider in the 1992 DOT Appropriations Act as an order mandating the agency to ban radar detectors. In contrast, the Appropriations Act merely directed the agency to publish a notice of proposed rulemaking in order to "solicit testimony regarding the safety, economic, and operational aspects of prohibiting radar detectors in commercial operations." 1992 DOT Appropriations Act, Pub.L. No. 102–143, § 342 (1991). Therefore, Congress did not force the agency to consider factors outside of those in the 1984 Safety Act but simply directed that a rulemaking be undertaken pursuant to, and in accordance with the rulemaking provisions of the 1984 Safety Act. Thus, we also reject petitioners' argument that by ordering the agency to ban radar detectors in CMVs, Congress violated the principles of separation of powers. *See Metropolitan Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991).

Similarly, the Congressional remarks made by the 1993 Senate Appropriations Committee did not direct the agency to adopt a ban. Petitioners cite *D.C. Federation* in support of their argument that the rulemaking must be reversed due to improper political pressure. However, petitioners' reliance on *D.C. Federation* is misplaced. In *D.C. Federation,* a

Representative of the House attempted to coerce a favorable decision from the Secretary of Transportation by threatening to withhold funds for another project. In fact, those funds were blocked pending the decision of the Secretary. *D.C. Federation*, 459 F.2d at 1245. Clearly, the alleged political pressure in this case does not rise to this level of egregiousness. In this case, the Senate Appropriations Committee did not order the agency to promulgate a rulemaking banning radar detectors in CMVs nor did they threaten to withhold the agency's funds if the agency did not comply with their wishes. Rather, the Committee merely expressed its displeasure that the agency had not taken action in the eighteen months since the NPRM was issued. Moreover, the Committee directed the agency to conduct a study on the correlation between the use of radar detectors in CMVs and traffic safety and to inform the Committee "as soon as possible on the future direction that the Agency will pursue regarding this matter." S.Rep. No. 150, 103d Cong., 1st Sess. 111 (1993). Thus, the Committee did not urge the agency to consider extraneous factors when considering the rulemaking.

Furthermore, the Congressional remarks at issue in this case were not improper. As the District of Columbia Circuit noted in *Costle:*

> Americans rightly expect their elected representatives to voice their grievances and preferences concerning the administration of our laws. We believe it entirely proper for Congressional representatives to represent the interests of their constituents before administrative agencies engaged in informal, general policy rulemaking, so long as individual Congressmen do not frustrate the intent of Congress as a whole as expressed in statute, nor undermine applicable rules of procedure. Where Congressmen keep their comments focused on the substance of the proposed rule ... administrative agencies are expected to balance Congressional pressure with the pressures

emanating from all other sources. To hold otherwise would deprive the agencies of legitimate sources of information and call into question the validity of nearly every controversial rulemaking.

*Costle*, 657 F.2d at 409–10. Moreover, the agency clearly stated in the preamble to the final rule that the basis for its rulemaking was grounded in the safety issues presented in the comments it received and studies in the 1990 petition for rulemaking. Radar Detectors in Commercial Motor Vehicles, 58 Fed.Reg. 67370, 67371 (1993). Further, the agency prepared its regulatory evaluation in support of the final rule in August 1993, and the Senate Appropriations Committee Report, which allegedly improperly pressured the agency, was not issued until September 29, 1993. Accordingly, we hold that the agency did not consider extraneous factors when determining whether to promulgate the rulemaking banning the use of radar detectors in CMVs.[13]

### D.

 Finally, the Owner–Operator Independent Drivers Association, Inc. ("OOIDA"), amicus curiae in support of petitioners, argues that by banning the use of radar detectors in CMVs only, the rulemaking denies CMV operators equal protection of the laws in violation of the Due Process Clause of the Fifth Amendment. Specifically, OOIDA argues that the justification for the rule, that radar detectors cause speeding and speeding causes accidents, applies equally to all vehicles and that the agency improperly limited the ban to CMVs because of " 'a ... congressional desire to harm a politically unpopular group[,]' " i.e., CMV operators. OOIDA's Brief at 3 (quoting *Johnson v. Robison*, 415 U.S. 361, 383, 94 S.Ct. 1160, 1173, 39 L.Ed.2d 389 (1974)).

 The Supreme Court has held that "Fifth Amendment equal protection claims are cognizable under the Amendment's Due Process Clause." *Delaware Tribal Business*

---

13. Petitioners make an unusual request that we transfer the action to a district court for an evidentiary hearing pursuant to 28 U.S.C. § 2347 if we conclude, as we do, that the record does not support their argument that FHWA promulgated the rulemaking because of improper Congressional pressure. From our review of the record, we do not believe that an evidentiary hearing is warranted.

*Comm. v. Weeks,* 430 U.S. 73, 75 n. 1, 97 S.Ct. 911, 914 n. 1, 51 L.Ed.2d 173 (1977). Moreover, " '[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.' " *Id.* (quoting *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976)). In determining whether the agency denied CMV operators equal protection of the laws by only prohibiting the use of radar detectors in CMVs,

> ... our analysis of the classification proceeds on the basis that, although an individual's right to equal protection of the laws does not deny ... the power to treat different classes of persons in different ways(;) ... (it denies) the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'

*Robison,* 415 U.S. at 374–75, 94 S.Ct. at 1169 (quoting *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971)). In addition, this court has held that "When an allegedly unconstitutional classification involves 'the area of economics and social welfare' and does not involve suspect classifications or fundamental rights ... a court must examine the classification in accordance with a 'rational basis' standard." *Malis v. Hills,* 588 F.2d 545, 548 (6th Cir.1978) (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)).

The purpose of the 1984 Safety Act, the statute creating FHWA's rulemaking authority, is to "promote the safe operation of commercial motor vehicles ... and to assure increased compliance with traffic laws ..." 49 U.S.C. App. § 2501. The agency argues that the radar detector ban is properly limited to CMVs because (1) Congress demonstrated a clear concern for the safe operation of CMVs on interstate highways by enacting the 1984 Safety Act, and (2) the different physical characteristics of CMVs and other vehicles justifies different treatment. We agree. As discussed above, FHWA promulgated the rulemaking in order to reduce speeding and thereby reduce the severity of accidents when they occur. Moreover, because CMVs are much larger and heavier than other vehicles, the damage they cause when they are involved in accidents at excessive speeds is much greater. Thus, we conclude that drivers of CMVs and drivers of other vehicles are not similarly circumstanced for purposes of an equal protection claim. Further, petitioners presented no evidence that the rulemaking was designed primarily to harm a politically unpopular group. Therefore, we hold that the application of the ban to CMVs only is rationally related to the safety objective of the 1984 Safety Act and does not violate equal protection guarantees of the Fifth Amendment.

### III.

For the reasons stated, the petition for review of the rulemaking of the Federal Highway Administration banning radar detector use in commercial motor vehicles is DENIED.