UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

SUNLAND PACKING HOUSE
COMPANY, Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

SAN JOAQUIN CITRUS, and Sunkist
Growers, Inc., Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

BAIRD–NEECE PACKING CORP., and
Sunkist Growers, Inc., Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

OXNARD LEMON COMPANY,
et al., Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

MISSION CITRUS COMPANY,
et al., Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

VENTURA PACIFIC COMPANY,
et al., Defendants.

UNITED STATES ex rel. SEQUOIA
ORANGE COMPANY,
Plaintiff,

v.

SATICOY LEMON ASSOCIATION,
et al., Defendants.

UNITED STATES ex rel. Lisle
BABCOCK, Plaintiff,

v.

DOLE CITRUS, INC., Defendant.

Nos. CV–F–88–566–OWW, CV–F–89–002, CV–F–89–004, CV–F–89–006 to CV–F–89–008, CV–F–89–012 to CV–F–89–014, CV–F–89–050 to CV–F–89–062, CV–F–91–194–OWW, CV–F–91–195 to CV–F–91–197 and CV–F–93–5016–OWW.

United States District Court,
E.D. California.

Sept. 27, 1995.

**1328**

Daniel Bensing, Asst. U.S. Attorney, Fresno, CA.

James Moody, Washington, DC.

Brian Leighton, Clovis, CA.

Gerald Vinnard, Thomas, Snell, Jamison, Russell & Asperger, Fresno, CA.

Michael Bierman, Jeffrey Wexler, Tuttle and Taylor, Los Angeles, CA.

Robert L. Compton, Nordman, Cormany, Hair & Compton, Oxnard, CA.

Stephen Altman, Civil Division, Department of Justice, Washington, D.C.

Kendall Manock, Baker, Manock and Jensen, Fresno, CA.

Steven Williams, Williams, Jordan & Broderson, Visalia, CA.

## MEMORANDUM OPINION & ORDER RE: UNITED STATES' MOTION TO DISMISS

WANGER, District Judge.

### I. BACKGROUND

These 27 partially consolidated False Claims Act (FCA) cases are before the court on the United States's motion to dismiss under 31 U.S.C. § 3730(c)(2)(A).[1] The motion presents a question of first impression.

### A. Statutory Background.

The claims arise from alleged violation of prorate restrictions and reporting requirements in navel and valencia orange marketing orders (7 C.F.R. §§ 907 and 908)[2] and the lemon marketing order (7 C.F.R. § 910). The relators, Sequoia Orange Company, a handler (processor) and, Lisle Babcock, a grower of oranges, are competitors of defendants. Defendants are Sunkist Growers, Inc., an agricultural cooperative corporation and packinghouses, most of whom are Sunkist affiliates. Relators contend that despite the defendants' support for marketing orders, defendants for some ten years have consistently violated prorate and other regulations of the orders by overshipping oranges and failing to accurately report, account, and pay assessments for those overshipments which give rise to the asserted false claims. A bitter ideologic dispute over citrus industry regulations between relators and defendants has continued for more than ten years.

For the purposes of the motion, the parties assume the merit of the FCA claims, subject to the United States' objection to subject matter jurisdiction that FCA claims based on alleged violations of the Agricultural Marketing Agreement Act (AMAA) implicate a regulatory fine that cannot support a claim as a matter of law.[3] Relators have prosecuted

---

**1.** "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the Court has provided the person with an opportunity for hearing on the motion."

**2.** All citations to the Code of Federal Regulations refer to the 1994 edition. The regulations pertaining to the citrus marketing orders do not appear in the 1995 edition because the orders were terminated in 1994.

**3.** This apparent inconsistency is explained by reference to the history of the government's initial

these lawsuits and relentlessly waged a campaign of public criticism against Sunkist and its members' alleged economic domination of the industry, claimed to have been effectuated primarily through government regulation under the AMAA. To decide the dismissal motion, the long and complex history of disputes over Marketing Orders in the California–Arizona citrus industry must be analyzed.

The parties disagree on whether the applicable standard for decision is: (1) an unreviewable prosecutorial discretion standard; (2) a rational relation standard; or (3) a Federal Rule of Civil Procedure Rule 41(a) non-prejudice standard.

### 1. The Agricultural Marketing Agreement Act of 1937.

The underlying law requires us to "delve into one of the more byzantine, and all-encompassing, areas of federal administrative regulation—that governing fruits and vegetables." *Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367, 1372 (9th Cir.1995). The Agricultural Marketing Agreement Act of 1937 (AMAA) was enacted "to establish and maintain ... orderly marketing conditions for agricultural commodities in interstate commerce." 7 U.S.C. § 602(1). Congress believed that improved marketing conditions for agricultural products would benefit both producers and consumers by ensuring "an orderly flow of the supply [of fruits and vegetables] to market throughout [their] normal marketing season to avoid unreasonable fluctuations in supplies and prices." 7 U.S.C. § 602(4). "The Act contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 346, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984).

To achieve these goals the AMAA provides the Secretary and the industry with a powerful tool, the marketing order. Through marketing orders the Secretary and the industry may regulate, *inter alia*, the quality, size, and quantity of a particular commodity shipped to market. Marketing orders are essentially self-help mechanisms to advance the economic interests of the industry. The Secretary is not required to promulgate marketing orders in each fruit or vegetable industry that is eligible under the AMAA. Clayton 107:7–10.[4] The Secretary generally does not advocate marketing orders in unregulated industries unless industry participants request assistance in obtaining an order.[5] Clayton, at 110.

Marketing orders become effective upon approval by the Secretary and the industry. When the Secretary believes a proposed order will tend to effectuate the declared policy of the AMAA, the industry must be provided notice and an opportunity for a hearing on the proposed order. 7 U.S.C. § 608c(3), (4). If after the hearing the Secretary issues an order finding that the proposed order will effectuate AMAA policies then an industry referendum is conducted. In the citrus industry marketing orders must be approved by (1) handlers marketing eighty percent of the volume of the commodity and (2) either three-quarters of the affected growers or by growers who market at least two-thirds of the volume of the particular commodity (navels, valencias, or lemons). 7 U.S.C. § 608c(8). The Secretary may waive the necessity for handler support by finding that handler refusal to sign the agreement tends to prevent the effectuation of the AMAA. 7 U.S.C. § 608c(9); *see also United States v. Sunny Cove Citrus Ass'n*, 854 F.Supp. 669, 676 (E.D.Cal.1994).

Once effective, marketing orders are implemented by committees composed of industry members. 7 U.S.C. §§ 608c(7)(C), 610.

---

declination to take over the cases after denial of its motion to dismiss for failure to state a claim, and later intervention to "settle the cases." 31 U.S.C. §§ 3730(c)(2)(B) and (c)(3).

**4.** Testimony given during the evidentiary hearing is referenced by the last name of the witness and the relevant transcript page.

**5.** Nonetheless, "a marketing order may be proposed *by the Secretary* or by any other person." 7 C.F.R. § 900.3 (emphasis added).

Committee members are nominated by industry groups, appointed by the Secretary, and supervised by the Agricultural Marketing Service (AMS), an agency within the United States Department of Agriculture (USDA). *See, e.g.,* 7 C.F.R. §§ 907.22, 907.23. The committees recommend rules and regulations to effectuate the marketing orders, to govern matters such as fruit quality and flow to market restrictions, which the Secretary may adopt through informal rulemaking. 7 C.F.R. §§ 907.52, 907.64.

The expenses to administer the marketing orders are funded through assessments imposed upon fruit handlers based on the volume of fruit they ship. 7 U.S.C. § 610(b)(2)(ii). The committees annually submit budgets and a recommendation for the rate of assessment to the Secretary. 7 C.F.R. §§ 907.41. The Secretary approves the committees' budgets and the assessments to be imposed on handlers each year in the form of a regulation.

Marketing orders have regulated the California–Arizona orange industry since 1954. *Cecelia Packing Corp. v. U.S. Dept. of Agriculture,* 10 F.3d 616, 618 (9th Cir.1993). Each citrus order contained prorate provisions, which limited the weekly volume of fruit shipped to market. The efficacy of prorate has been bitterly disputed by industry members, particularly Sequoia.

Defendant Sunkist is an agricultural cooperative corporation, a protected form of entity under the AMAA. It has affiliated packinghouses and member growers. Through bloc-voting,[6] Sunkist allegedly perpetuated prorate, while many independent growers and packinghouses, as well as some Sunkist members, opposed prorate and other forms of federal regulation of the industry. Relators have for over ten years claimed that defendants, particularly Sunkist, exercise enhanced access to and influence over the USDA and members of Congress, by virtue of defendants' political influence, lobbying efforts, and campaign contributions to elected officials. These efforts allegedly resulted in the adoption of marketing orders with prorate and appointment of defendants and their supporters to industry AMAA commodity (navel and valencia orange) committees (NOAC and VOAC).

Under prorate, the commodity committees meet each week during the harvest season to recommend a total quantity of oranges and lemons for shipment to market the following week. 7 C.F.R. §§ 907.51, 908.51, 910.51. Producers pay assessments to the committees based on the volume of fruit shipped to market. 7 C.F.R. §§ 907.41, 908.41, 910.41. Handlers who ship quantities of citrus in excess of their allocated prorate are subject to criminal fines of up to $5,000 per violation and civil penalties of $1,000 per violation. 7 U.S.C. § 608c(14). They are also subject to civil forfeitures for quantities of fruit shipped in excess of prorate. The amount of the forfeiture is "a sum equal to the value of such excess at the current market price for such commodity at the time of violation." 7 U.S.C. § 608a(5). The United States is authorized to initiate criminal prosecutions and forfeiture suits against handlers who violate prorate. 7 U.S.C. § 608a(7). The most onerous result of prorate is the dumping of fruit required when supply exceeds available prorate quotas.

## 2. The False Claims Act.

The FCA creates liability for those who defraud the government. One species of fraud claim under the FCA, the so-called "reverse false claim," makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). The penalty for violation of the FCA is a fine of not less than $5,000 and not more than $10,000 per false report plus three times the amount of damages the government sustains as a result of the fraud. 31 U.S.C. § 3729(a).

---

**6.** The AMAA provides that whenever the Secretary conducts a referendum on grower support for a marketing order "the Secretary shall consider the approval or disapproval by any cooperative association of producers … as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association." 7 U.S.C.A. 608c(12); *see also Cecelia Packing,* 10 F.3d 616, 621–25 (9th Cir.1993) (the bloc-voting provision does not infringe First Amendment freedoms or violate equal protection).

The FCA includes provisions to encourage "whistleblowing" by private individuals with knowledge of fraud on the government. Under these *qui tam* provisions, a private party, called a relator, may initiate a suit under the FCA in the name of the federal government. 31 U.S.C. § 3730(b). However, the complaint must be filed under seal for 60 days before it is served on the defendant. During this time the government can elect to intervene in the action or decline to take over the action. *Id.* In the latter case, the relator may proceed with the case. 31 U.S.C. § 3730(c)(1). If the government ultimately obtains a recovery the relator is entitled to a percentage of the proceeds, which depends upon the relator's involvement in the case, as well as reasonable costs and attorneys' fees. 31 U.S.C. § 3730(d).

In these FCA cases, relators allege the defendants created false reports and documents to conceal fruit shipments in excess of their prorate allotment and intentionally avoided payment of assessments for unreported overshipments and forfeitures payable for undocumented shipments.[7] The government has steadfastly maintained no claim can be stated under the FCA for violation of AMAA prorate regulations.[8] Originally the government prosecuted Sequoia and other orange growers and handlers for alleged AMAA violations and sought to deny Sequoia's participation as relator in these cases.

Under the citrus marketing orders, handlers are required to complete and submit reporting documents to the commodity committee when shipping fruit. They must provide daily (form 3) and weekly (form 4) reports of fruit shipped. *See, e.g.,* 7 C.F.R. §§ 908.140 and 908.141. They must also complete an assignment of allotment certificate (form 8). *E.g.* 7 C.F.R. § 908.58. Finally, the marketing orders require handlers to keep other records such as truck manifests and customer invoices. *E.g.* 7 C.F.R. § 908.173. Relators allege that a mismanifested shipment of fruit could result in as

many as five false records, forms 3, 4, and 8, plus a shipping manifest and a customer invoice. At a minimum, an unrecorded shipment results in two false records, forms 3 and 4. The loss to the government is claimed to be unpaid assessments calculated on unreported volume of overshipped fruit, 7 U.S.C. § 610(b)(2)(ii), and the AMAA forfeiture (market value of the excess fruit). Relators also seek penalties of up to $10,000 for each false record made in connection with a prorate violation and three times the market value of the fruit shipped in excess of prorate. Total claims are estimated to approach four hundred million dollars.

### B. History of the Litigation.

Sequoia, an independent packinghouse that competes with defendants in the citrus industry, has been accused of shipping oranges in excess of its prorate allotment in a 1983 AMAA forfeiture action brought by the government. Sequoia was sanctioned in that litigation for intentional document destruction in violation of court order. Although Sequoia is a vehement critic and opponent of the California–Arizona citrus marketing orders, particularly the prorate feature, Sequoia denies it cheated on prorate. It complains that the USDA ignored widespread cheating by other members of the industry, particularly Sunkist, the dominant co-op in the California–Arizona citrus industry, and its associated packinghouses and members, Sequoia counterclaimed against the USDA charging it was being selectively prosecuted for its opposition to the marketing orders. The counterclaim was dismissed on the ground that the government is not barred from selectively prosecuting prorate cheaters in its exercise of prosecutorial discretion. *See United States v. Sequoia,* CV–F–83–510, order filed March 14, 1994.

In December of 1988 Sequoia filed the first of these FCA cases alleging violation of the

---

7. The relators contend the defendants concealed excess shipments by two methods. The first method was to not record shipments in excess of the prorate allotment for a particular week. The second method, sometimes called "mismanifesting", was to falsely record the date of a shipment. Fruit shipped during weeks in which the packinghouse did not have sufficient prorate was mismanifested to appear that it was shipped during a different week.

8. Statements by the government's trial counsel concerning the intention of the United States as plaintiff to prosecute these FCA cases are the subject of dispute.

navel and valencia orange marketing orders. In 1989 it filed 22 more orange cases naming Sunkist and Sunkist-affiliated packinghouses. The government moved to dismiss those cases, arguing no FCA claim could be stated for false statements made in connection with AMAA prorate regulations. The government's motion was denied on July 5, 1989. The government elected not to intervene in the cases.

In 1991, Sequoia filed four additional FCA cases alleging violations of the lemon marketing order. The government again moved to dismiss the cases for failure to state a claim. The motion was denied by a different judge. Unlike the orange cases, the government elected to intervene in the lemon cases. The last FCA case was filed in 1993 by Lisle Babcock, an orange grower, against Dole Citrus, although Sequoia has nine additional cases.

The government conducted its own investigations into alleged prorate violations between 1989 and 1991. It began filing AMAA cases based upon the evidence it uncovered. In June of 1993 the government decided to seek a "global" settlement of all AMAA and FCA cases alleging prorate violations to end industry turmoil. To facilitate FCA settlements the government moved to intervene in the orange cases. The relators opposed the government's motion to intervene, claiming intervention would lead to a "sweetheart" settlement, that the government would not vigorously pursue the cases by reason of its opposition to use the FCA for AMAA enforcement, and because the USDA was under the alleged political influence of Sunkist and other of the packinghouse defendants. At an August 9, 1993, hearing on the government's intervention motion, the government's trial counsel, in response to specific inquiry from the court whether it would prosecute the FCA claims if the cases were not settled, stated that the government intended to litigate the FCA claims if necessary. (Trans. pp. at 22–24). A high level of mistrust and hostility, actual and legal, has existed between relators and the government from the inception of these cases.

The government's motion to intervene was granted based upon its trial counsel's representation that it would pursue the FCA claims if no settlement was reached.[9] Settlement procedures were then established which required that relators be allowed to object to any settlement of the FCA cases. However, based upon allegations that relators were using the cases to destroy the businesses of the defendants and to create sufficient disruption in the industry to facilitate the demise of prorate and marketing orders, relators were not allowed to participate directly in settlement negotiations. 31 U.S.C. § 3730(c)(2)(C) and (D). The defendants and the government believed that confidential financial and transactional information about the defendants, to be provided during the settlement process, could be used by the relators to the detriment of the defendants, to harass them in existing FCA cases and to obtain facts to support new FCA cases. The defendants opposed disclosing confidential operating data and evidence of their financial condition. *See* 7 U.S.C. § 608d. However, court-ordered settlement procedures required that the government disclose terms of any settlement reached by it with the defendants to allow the relators the opportunity to exercise their right to object to any settlement under 31 U.S.C. § 3730(c)(2)(B).

In June of 1993 the USDA suspended the prorate feature of the citrus marketing orders. It requested that members of the industry propose amendments to the current marketing orders. Although some proposals were submitted to the Secretary, he concluded that none of them had sufficient support within the industry to justify a hearing.

On April 18, 1994, this court issued a ruling on summary judgment motions in *United States v. Sunny Cove Citrus Ass'n*, 854 F.Supp. 669 (E.D.Cal.1994), which held the

---

9. In the evidentiary hearing on these motions testimony revealed for the first time, that the USDA never intended to litigate the FCA cases; its only purpose for intervention in the cases was to settle them. Rominger, at 214, 261; Golden, at 634. Intervention was ordered over relators' objection that they had a nondefeasible vested interest in these *qui tam* cases. *See* Mem.Op. & Order re U.S. Mot. to Dismiss, at 14–15. Relators' right to share in the FCA bounty is subject to defeasance if the government moves to dismiss or settle the case over the relators' objection. 31 U.S.C. §§ 3730(c)(2)(A), (2)(B).

1984 navel and valencia orange marketing orders, Nos. 907 and 908, were unlawfully promulgated. The *Sunny Cove* decision was the final chapter of a controversy that began in July of 1984 when the Secretary of Agriculture proposed 21 amendments to the orange marketing orders. 49 Fed.Reg. 19,-071 (1984). The Secretary issued a finding that all 21 amendments tended to effectuate the policies of the AMAA and that the existing orders did not. *Sunny Cove*, 854 F.Supp. at 681. Initially, the Secretary required that the industry vote on the amendments as a package. If the package was defeated in the referendum then the existing orange marketing orders would be terminated and the industry would go unregulated. *Id.* After intense lobbying by Sunkist in Congress [10] and of the USDA, the Secretary reversed his decision and allowed growers to vote on each amendment separately. 49 Fed.Reg. 32,080 (1984); *see also Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 754, 757–58 & n. 5 (9th Cir.1992).[11] Only 13 of the amendments were ratified in the referendum. The Secretary issued a new finding, made without notice or opportunity for comment, that the newly amended orange marketing orders tended to effectuate the policy of the AMAA. *Sunny Cove*, 854 F.Supp. at 681.

Sequoia filed a petition challenging the validity of the valencia orange order. Judge Price invalidated the valencia order, because the Secretary did not follow the requirements of the Administrative Procedure Act (APA) when he reversed the finding that the orders did not tend to effectuate AMAA policy absent all 21 amendments without notice or comment. The Ninth Circuit affirmed in *Sequoia Orange Co. v. Yeutter*, 973 F.2d at 759. Both the Appeals and trial courts afforded the Secretary opportunity to cure any deficiencies in the orders. After the Ninth Circuit decision, the Secretary announced,

again without notice or opportunity for comment, that the pre-amendment orders promoted AMAA policy and would remain in effect. Sunny Cove Citrus Association sued, in 1991, challenging the validity of the pre-amendment orders.

The *Sunny Cove* decision held that the Secretary was bound by the implicit tendency finding that the unamended orders did not effectuate the AMAA without adoption of all 21 proposed amendments. The Secretary was ordered to comply with the APA's notice and comment requirements before changing this negative tendency finding. *Sunny Cove* found that the pre-amendment orders were not terminated and gave the Secretary a third opportunity to address defects in the orders that resulted from the Secretary's 1984 tendency finding.

On May 16, 1994, the USDA announced its decision to terminate all three California–Arizona citrus marketing orders, 59 Fed.Reg. 44020 (Aug. 26, 1994), dismiss all pending AMAA enforcement actions, and withdraw from the FCA cases. The USDA's justification was to end the divisiveness in the citrus industry caused by over ten years of acrimonious litigation. *See* Ex. G–15 (USDA press release, May 16, 1994). No one disputes that the citrus industry was rife with strident disputes among independents, led by relators on one side, and Sunkist and its members, over continuance of prorate and the disputed marketing orders.

After the May 16, 1994, decision, defendants intensely lobbied Congressional representatives and USDA officials to dismiss the FCA cases. The USDA requested that the U.S. Department of Justice (DOJ) move to dismiss the FCA cases. The DOJ studied the request and then invited all of the parties to present their views. After reviewing legal briefs and written arguments from the relators [12] and the defendants, Exs. G–30 to G–

---

10. In response to pressure from those opposing the all or nothing approach to the amendments, Congress attached riders to two agricultural appropriation bills, making the funds contingent upon the Secretary allowing growers to vote on each amendment separately. *See* Act of August 22, 1984, Pub.L. No. 98–396, 1984 U.S.C.C.A.N. (98 Stat.) 1369; Act of October 12, 1984, Pub.L. No. 98–473, 1984 U.S.C.C.A.N. (98 Stat.) 1837.

11. The Ninth Circuit noted that the declaration of then Deputy Secretary of Agriculture John

Ford stated, "the Secretary was in effect politically blackmailed into abruptly and without rational reason or legal justification changing the Final Decision." *Sequoia Orange Co. v. Yeutter*, 973 F.2d at 758 n. 5.

12. The relators also met with Charles J. Stevens, the United States Attorney for the Eastern District of California, on June 14, 1994, to express their view that the government should prosecute

32, the government moved for dismissal of the FCA cases in August of 1994. Following briefing, and oral argument on the motion to dismiss on October 24, 1994, an evidentiary hearing was ordered.

## C. The Evidentiary Hearing.

A four-day evidentiary hearing was conducted in June of 1995. All of the parties were afforded the opportunity to present evidence and cross-examine witnesses. The parties also submitted deposition testimony, documentary evidence, and post-hearing legal memoranda. The following additional facts were adduced.

In 1988 the USDA received complaints from Sequoia and Jack Stetson, a former NOAC and VOAC auditor of citrus marketing order compliance, of widespread prorate violations.[13] Mr. Stetson charged that prorate violations by Sunkist packinghouses were swept under the rug by corrupt committee members who represented Sunkist and committee auditors. Dave Lewis, the Director of the Office of Compliance for the AMS testified that Stetson's claims were carefully investigated. Lewis, at 291–93. The AMS found no evidence of discriminatory enforcement or corruption in the commodity committees. *Id.* at 293–94.

During its investigation of Mr. Stetson's claims the AMS discovered that the citrus committees were not adequately enforcing compliance with prorate: their auditors lacked expertise; audit coverage was spotty and shallow; and audit documentation insufficient. The AMS urged the committees to improve their investigative capabilities, increased its oversight of the committees' enforcement efforts, and became directly involved in investigations of possible prorate violations. Lewis, at 295–304. Subsequent roadside inspections of shipping manifests and examination of third party records uncovered evidence of systematic prorate cheating by Sunkist packinghouses and independent packinghouses. Lewis, at 306–13; Exs. G–58, G–59, G–60.

Based upon the growing evidence of widespread prorate cheating throughout the industry, in 1992 the USDA initiated "Operation Fair Enforcement," in conjunction with the U.S. Attorney's Office and the Office of the Inspector General. Clayton, at 52. The AMS paid the salary of a Special Assistant United States Attorney who instituted numerous AMAA forfeiture actions against defendant packinghouses and others for alleged prorate violations.

The USDA concluded during 1992 and 1993, that the industry-wide cheating was indicative of dissatisfaction with and divisiveness over the marketing orders. There was a particularly strong difference of opinion over the need for prorate restrictions. Clayton, at 58. In December of 1992 Secretary Madigan informed the citrus industry that he would not entertain prorate recommendations from the commodity committees for the remainder of the season. Clayton, at 56. Sunkist, the strongest proponent of prorate, filed suit in U.S. District Court in Washington D.C. challenging the Secretary's decision. The Secretary's decision was judicially affirmed.

In June of 1993 the USDA announced suspension of prorate and invited the industry to propose amendments to the California–Arizona citrus marketing orders. In response to the USDA's call for amendments the commodity committees held industry meetings to determine whether there was consensus for an amended order. Several proposed amendments were submitted, but considerable division in the industry existed over whether prorate should be retained and whether a generic advertising program should be implemented. Clayton, at 61.

A significant segment of the industry expressed an interest in amending the orders. Notes of NOAC and VOAC meetings show navel and valencia advisory committees made substantial efforts to build consensus around amendments to the *citrus marketing orders.* Exs. G–49 to G–55. In December of 1993,

---

the FCA cases rather than dismiss them. Ex. G–33.

**13.** The evidence established that Sequoia, through counsel, has for over ten years been

waging political, public relations, and litigation campaigns seeking to overturn the orange marketing orders and prorate.

the NOAC and VOAC sent a joint letter to the USDA requesting assistance with the amendatory process. Ex. G–69. USDA policy makers were informed by staff who attended the industry committee meetings that the litigation pending in the industry was impeding the amendatory process. Clayton, at 135.[14]

The government in June 1993 proposed a global settlement package to all industry members sued for or suspected of prorate violations, whether under the AMAA or the FCA. The DOJ's trial counsel attempted to negotiate settlements in all pending AMAA and FCA cases. USDA officials concluded that counteroffers proposed by some defendants were too low. Clayton, at 156. By February of 1994, USDA officials believed the settlement process was moving very slowly and that the likelihood of settlement was remote. The USDA viewed Sunkist as culpable and that it should participate in any settlement. Rominger, at 196–97. However, Sunkist denied liability and adopted a stonewall position refusing to consider settlement.

After the April 1994 *Sunny Cove* decision invalidating orders 907 and 908, USDA officials doubted they could address the 1984 tendency finding without speculating as to the reasons for Secretary Block's decision or without considering the subsequent industry division and turmoil over the orders. Clayton, at 77–78; Rominger, at 199–200. They worried any attempt to reestablish the 1984 tendency finding would only spawn more litigation. Rominger, at 200.

The USDA concluded it could not continue to prosecute the AMAA orange forfeiture cases without curative rulemaking. USDA rejected amending the AMAA cases to state FCA claims in deference to the DOJ's belief

FCA claims could not be stated as a matter of law. After the *Sunny Cove* decision, defendants were unwilling to offer settlements.

USDA officials [15] reevaluated their citrus industry policies after *Sunny Cove*. Based upon failure to settle the AMAA enforcement and FCA litigation, futile attempts to achieve consensus for an amended order, and the prospect of either dismissing the AMAA cases or facing more litigation after *Sunny Cove*, USDA decided it was no longer in the interest of the citrus industry to pursue AMAA enforcement actions. The Secretary concluded that the best way to advance the interests of the industry was to "clean the slate." This meant terminating the citrus marketing orders, dismissing the pending AMAA cases, and withdrawing from the FCA cases. USDA officials wanted to "wipe the slate clean" to the maximum extent possible. Clayton, at 82. However, USDA believed it lacked authority to dismiss the FCA cases and only sought to withdraw from the FCA cases. Clayton, at 82; Rominger, at 238; Golden, at 644–45.

The USDA's primary motivation was to end the divisiveness and lawlessness it perceived within the industry and to foster the development of new marketing orders. However, USDA officials considered several other factors, including the detrimental economic impact on the industry of the cost of defending against enforcement litigation and the potentially destructive effect of liability faced by defendants in the FCA litigation. Deputy Secretary Rominger was informed by staff that potential FCA liability could bankrupt some packinghouses. Rominger, at 203. No analysis of the packinghouses' litigation expenses and financial exposure based on defendants' financial capacity was performed.

---

14. Dr. Clayton could not recall specifically when or by whom he was informed that pending litigation was inhibiting the amendment process. Clayton, at 135–36. Nor could he recall any particular industry participant stating that it would not agree to a new marketing order unless the enforcement litigation was terminated. *Id.* at 134:18–25. Deputy Secretary Rominger recalled three specific occasions on which he was informed that pending litigation was hindering consensus for new amendments. He was told this by Sunkist representatives, representatives of defendant packinghouses, and Joel Nelson, president of California Citrus Mutual. Rominger, at

223:17–25; 225:17:23; 226:14–17. Robert Keeney testified that during discussions with staff and industry members he learned that the pending litigation was "weighing very heavily on the minds of the handlers and . . . the minds of the farmers." Keeney, at 367.

15. The principal officials involved in the decision were Deputy Secretary Richard Rominger, Acting Deputy Assistant Secretary Dr. Ken Clayton, Counsel to the Secretary Kim Schnoor, and Associate General Counsel John Golden. Clayton, at 80.

*Id.;* Clayton, at 170–71. The harmful financial impact of the litigation on the industry, though not a "determining factor," was a concern. Rominger, at 265.

Several other reasons were considered: "the message that would be sent to other industries with marketing orders;" Clayton, at 86; Rominger, at 202; the negative reaction of innocent handlers, who were harmed by prorate cheating, and of those handlers who cheated but previously settled with the USDA; Schnoor, at 104; Clayton, at 88; the USDA's investment in the cases; Clayton, at 85; Rominger, at 203; and the importance of enforcement to the success of marketing orders. Clayton, at 92. These factors were of lesser importance compared to the goal of achieving industry cooperation. Clayton, at 92.

Termination of the 1984 marketing orders did not affect the USDA's pending AMAA case against Sequoia, because those claims arose out of violations of orders in effect prior to 1984. However, consistent with global amnesty, USDA dismissed the case against Sequoia, although the government viewed Sequoia as the most culpable prorate cheater.[16]

Sunkist representatives met with Deputy Secretary Rominger the morning the USDA announced termination of the marketing orders and the AMAA cases. When told the government would not dismiss the FCA cases, Sunkist requested a second meeting with Deputy Secretary Rominger. At that meeting they told him they believed the USDA's decision "was creating a gross injustice, unfairness in the extreme." Hanlin, at 605:6–7. Mr. Rominger responded the USDA believed it did not have authority to dismiss the FCA cases. Hanlin, at 605.

The Sunkist Board of Directors in correspondence to the USDA expressed their "outrage[ ]" over the government's failure to dismiss the FCA cases. On May 20, 1994, Sunkist requested that its growers, packinghouses, and district exchanges call the USDA and their representatives in Congress to tell them of the unfairness of not dismissing the FCA cases. Quarles, at 682; Ex. R–110. So

many phone calls were placed to the USDA that shortly after making the request Sunkist sent a second letter asking its members to stop calling the USDA because "they got the message." *See id.* Numerous letters were also sent to the members of Congress by Sunkist growers and packinghouses. Ex. R–111.

Sunkist's counsel in Washington D.C. wrote to the USDA to inform it of 31 U.S.C. § 3730(c)(2)(A), which Sunkist believed gave the government statutory authority to dismiss the FCA cases. Ex. R–95. Counsel for the packinghouse defendants wrote letters to members of Congress stating that the failure to dismiss the FCA cases created unfairness and threatened to destroy Sunkist and other defendants. These letters requested assistance in obtaining dismissal of the FCA cases pursuant to § 3730(c)(2)(A). *See* Exs. R–91, R–96, R–101. The extent of defendants' access to members of Congress is in part reflected by the adoption by members of Congress of a letter to the USDA, the substance of which was drafted by attorneys for the defendants. Ex. R–158.

In late May and early June, Mr. Quarles, Sunkist vice president for corporate relations, met with members of Congress and their staff to express his views on the USDA's decision to allow the FCA cases to go forward. Quarles, at 680–82. He also informed them of defendants' view that statutory authority permitted government dismissal of FCA claims. Several members of Congress contacted the USDA to inquire about the status of the FCA cases and to recommend that the USDA request the DOJ to dismiss the FCA cases. Rominger, at 208–09. On May 20, 1994, the USDA requested that the DOJ consider dismissing the FCA cases. Rominger, at 210–11; Ex. G–24.

The DOJ took the USDA's request under advisement and asked the parties to the FCA cases for their views on dismissal. All parties, including the relators, who personally met with the DOJ, submitted legal briefs and argument. Sunkist and the packinghouse

---

**16.** The government excluded Sequoia from the global settlement offer because it believed that Sequoia's conduct was more "egregious" than that of other prorate cheaters. Clayton, at 185–86.

defendants continued to contact members of Congress, the USDA and the DOJ to gain support for dismissal.[17] Several members of Congress contacted the Department of Justice to state their support for dismissal. Exs. G–26 (Senator DeConcini); G–27 (Representative Gallegly); G–28 (Senator Feinstein). On June 22, 1994, Assistant Attorney General Frank W. Hunger responded to each of these communications with a letter stating that the DOJ was "not in a position to respond at this time because this is a pending matter and no final decision has been reached." Exs. G–34 to G–36. In August of 1994 the DOJ, as lawyer for the United States, 28 U.S.C. §§ 516 *et seq.,* following its independent analysis, moved to dismiss all pending FCA cases.

At the hearing, the packinghouse defendants presented expert testimony concerning the financial impact of potential FCA damage awards on twelve packinghouses. Their first expert, Dr. Sexton, testified that the average FCA penalty in these cases could be as high as $14,157,000, excluding attorneys' fees.[18] Dr. Sexton was provided with anonymous summary financial information for 12 defendant packinghouses. In his opinion, none of these packinghouses had sufficient liquid assets and net equity to withstand a judgment of the magnitude sought by relators. Sexton, at 434:9–14. Only three of the twelve packinghouses could afford a $3 million judgment. Sexton, at 433. Dr. Sexton opined that any judgment that significantly exceeded the liquid assets of a packinghouse, requiring it to increase its long term debt, would force the packinghouse to increase the fees charged its growers. Consequently, such growers would switch to other packinghouses with less debt to avoid increased costs, putting the penalized packinghouses out of business. Sexton, at 436–38. Cooperative packinghouses are particularly suscepti-

ble to this cycle of disintegration. Sexton, at 439.

The packinghouse defendants' second expert, Dr. Carman, described the indirect economic effects a large penalty would have on the counties in which packinghouses operate. Dr. Carman based his analysis on "multipliers" that estimate the effect of increasing or decreasing spending in a particular county on employment, value added, and personal income. This "input-output" model estimates the effects of diffuse economic activity, such as the imposition of a new tax on a community. Carman, at 496–97. Dr. Carman offered his opinion that a one million dollar judgment would cause the loss of 14–17 jobs in the county of the particular packinghouse. He also estimated that such a judgment would reduce personal income in the community by $428,000 to $606,800. Carman, at 489–90. However, Dr. Carman testified he was unaware of any published or reported instance in which this economic model has been used to estimate the secondary effects on an entire community from a judgment against a particular business. Carman, at 497.

Relators' evidence established that fractious views are held by independent growers and packinghouses on the subjects of marketing orders and prorate. Relators and independent handlers and growers who support them are estimated to represent fifteen percent (15%) of the industry. They continue to hold contentious and hostile views toward Sunkist and its members. Roth, at 552:11–13; Elliott, at 401–02; *see also* Hanlin, at 629:14–21. Relators' proof raises serious doubt about the premise that dismissal of the FCA cases will bring "peace" to the citrus industry. Several of relators' witnesses stated dismissal of the FCA cases would inhibit the industry from reaching con-

---

**17.** *See, e.g.,* Exs. R–113, 115, 122, 124–26, 129, 132, 135, 138, 139, 150, 152, 154–57, 160, 162–64.

**18.** In reaching this figure Dr. Sexton assumed that each shipment in excess of prorate involved five false forms or statements and that each false form would result in the maximum penalty of $10,000. He also assumed that the average market price per carton of oranges is $7 and that a shipment contains 500 cartons. Thus, the total penalty for a hypothetical shipment in violation

of prorate would be a $50,000 fine for the five false statements plus three times the market value of a 500 carton shipment ($3,500) for a total of $60,500. Sexton, at 432–34. The average number of mismanifested shipments alleged against the packinghouse defendants in these cases is 234. Sexton, at 434:3–4. These assumptions overestimate potential FCA liability to the extent that five false forms are not filed for each shipment in violation of prorate. Sexton, at 473–74.

sensus for a new marketing order and will only exacerbate divisiveness in the industry.

## II. THE MERITS

### A. Standard of Review.

The government initially maintained its decision to dismiss FCA cases is unreviewable, as an exercise of its prosecutorial discretion. The court rejected this argument and required proof to show dismissal is rationally related to a legitimate government interest and not arbitrary and capricious, fraudulent, or illegal. All parties have submitted authority on alternative standards of review of dismissal: absolute prosecutorial discretion, rational relation, and Rule 41(a) prejudice.

A two part analysis applies to identify the standard of review: (1) What did Congress intend to be the standard of review for dismissals under § 3730(c)(2)(A)?; (2) Does that standard violate separation of powers by improper vesting of executive authority in the judiciary or the relator?

### 1. Unreviewable Prosecutorial Discretion

■■■ The government exercise of prosecutorial discretion to dismiss in criminal cases is governed by Fed.R.Crim.P. 48, and in civil cases by Fed.R.Civ.P. 41. The criminal rule contains no express standard for judicial review.[19] The civil rule vests the court with discretion to determine proper terms and conditions if the government seeks to dismiss a case after the defendant has answered or filed a motion to dismiss. Fed.R.Civ.P. 41(a). Voluntary dismissal of a FCA case is authorized by the express provision of § 3730(c)(2)(A) under a unique statutory scheme, which does not refer to the Federal Rules of Civil Procedure. Where two statutes are inconsistent, generally, the more specific statute prevails. *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir.1992). This case is governed by the specific FCA dismissal authority, § 3730(c)(2)(A). Congress is presumed to be knowledgeable of existing law pertinent to legislation it enacts. *Goodyear Atomic Corp.*

*v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 1711–12, 100 L.Ed.2d 158 (1988). It could have incorporated by reference the standards of Fed.R.Civ.P. 41(a) if it so intended, but did not. *See Hellon & Assocs.*, 958 F.2d at 298.

In their post-hearing brief the packing-house defendants argue that on its face § 3730(c)(2)(A) gives the executive the discretion to dismiss FCA cases for any reason (or no reason at all) so long as dismissal is not based upon constitutionally impermissible considerations such as race, religion, or exercise of First–Amendment rights. The statute provides no express standard of review for dismissal. The most that can be determined from the face of the statute is that Congress intended to provide the relator an opportunity to object to dismissal of a FCA case and to be heard by the court. That the statute requires a judicial hearing directly implies the decision to dismiss under § 3730(c)(2)(A) is reviewable by the court.

The defendants claim the statute is susceptible of only one interpretation is belied by the legal interpretation the USDA gave the dismissal section prior to filing these motions. John Golden, Associate General Counsel to the USDA, testified that prior to May 16, 1994, "the Department was of the view that some independent legal basis had to be adduced in order to seek dismissal of these cases and that [§ 3730](c)(2)(A) provided an opportunity for the government to seek to dismiss the cases if there was some other independent legal basis to do so." Golden, at 647:15–19. The USDA paper entitled "Overview of False Claims Act Issues" stated, "the government does not have authority to dismiss the *qui tam* cases unilaterally." Ex. G–1. Although statutory interpretations by the agency for whose benefit the case was prosecuted are not binding on the government in this motion,[20] they undercut the defendants' argument that the only plausible interpretation of § 3730(c)(2)(A) is to give the government unreviewable discretion.

---

19. Rule 48 states that the government may dismiss an indictment, information, or complaint "by leave of the court." Fed.R.Crim.P. 48(a). Consent of the defendant is required if dismissal is sought during trial. *Id.*

20. The Department of Justice, not the USDA, is principally responsible for interpreting and enforcing the FCA. Golden, at 644:16–20.

Because the statutory language of the dismissal section is ambiguous it is appropriate to consider legislative history. *See, e.g., Funbus Systems, Inc. v. California Pub. Utils. Comm'n,* 801 F.2d 1120, 1125–26 (9th Cir.1986). The legislative history of § 3730(c)(2)(A) and the 1986 amendments to the FCA provide insight to Congressional concern about the government's lack of resolve or willingness to prosecute FCA cases.[21] *See also U.S. ex rel. Schumer v. Hughes Aircraft Company,* 63 F.3d 1512, 1519 (9th Cir.1994); Senate Judiciary Committee, False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess. 25–26 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 5266, 5291. The Senate Report states that the relator's right to object to dismissal is intended to serve, "as a check that the Government does not neglect evidence, cause undue delay, or drop the false claims cases without *legitimate* reasons." *Id.* (emphasis added). The report articulates that an evidentiary hearing is appropriate "if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary or improper considerations." *Id.* Congressional concern about the government's improper dismissal of FCA cases was addressed by a hearing requirement and reference to a legitimate reason for dismissal. All

of this directly contravenes an unreviewable discretion standard.

■ Defendants implicitly suggest that Congress violated the constitutional principle of separation of powers by providing for judicial intervention to review the exercise of prosecutorial discretion in dismissal of an FCA case. The government argues that judicial review of prosecutorial discretion is limited to a determination of whether the government's conduct infringes constitutional guarantees, such as equal protection or First Amendment freedoms. The government and defendants are correct, the separation of powers doctrine places significant limits on the judiciary's power to review prosecutorial decisions, *see United States v. Microsoft,* 56 F.3d 1448, 1457–62 (D.C.Cir.1995), as does the language of the dismissal statute. Congress could have, but did not, provide a "fair, adequate and reasonable" review standard as it did in the FCA settlement approval section. § 3730(c)(2)(B). The court does not substitute its judgment for that of the executive on matters of policy, just as the court does not "sit as a 'superlegislature to weigh the wisdom of legislation.' " *Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963) (quoting *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952)).

---

**21.** The government and the defendants argue that the Senate Report cited in the text does not accurately reflect Congressional intent concerning the final bill passed by both houses. The relevant portion of the Senate version bill at the time of the Senate Report read as follows:

[the relator] shall be permitted to file objections with the court and petition for an evidentiary hearing to any proposed settlement or to any motion to dismiss filed by the Government. The Court may grant such an evidentiary hearing only upon a showing of substantial and particularized need.

132 Cong.Rec. S9805 (July 28, 1986). Subsequently this passage was removed from the bill and replaced with the language of the current statute:

The Government may dismiss the action notwithstanding the objection of the [relator] if the [relator] has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

31 U.S.C. § 3730(c)(2)(A). It does not follow from the amendment that the prior Senate Report no longer reflects Congressional intent with regard to FCA dismissals by the government. The substance of the dismissal provision is essentially unchanged from its earlier form except in two respects: (1) the enacted version of the bill does not explicitly state whether the hearing on the motion is an evidentiary hearing; (2) the enacted statute does not require the relator to show a "substantial and particularized need" to receive a hearing on the motion. Nothing in the legislative history or the amendments themselves suggest that Congress amended the bill to give the Department of Justice authority to dismiss FCA cases arbitrarily or for illegitimate reasons. To so interpret the law would in large measure defeat the express purpose of the FCA. Congress intended to increase the role of the relator in FCA litigation "to keep pressure on the Government to pursue the case in a diligent fashion." 132 Cong.Rec. H 9382 (October 7, 1986).

■ However, the constitutional separation of powers does not require that the government's exercise of prosecutorial discretion to dismiss a FCA case remain completely insulated from judicial review. *See United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 757 (9th Cir.1993); *cf. Microsoft,* 56 F.3d at 1462 ("the district judge is not obligated to accept a [consent decree] that, on its face and even after government explanation, appears to make a mockery of judicial power"). In *Boeing* the Ninth Circuit addressed several constitutional challenges to the FCA including, *inter alia,* that the provisions limiting government intervention in and dismissal of FCA cases improperly vest the judiciary with executive authority. *Boeing,* 9 F.3d at 755–57. The court recognized these provisions "may affect the government's prosecutorial discretion to some degree," but concluded: "the FCA does not authorize the judiciary to infringe on prosecutorial discretion beyond the bounds established" by the Supreme Court in *Morrison v. Olson,* 487 U.S. 654, 691–93, 108 S.Ct. 2597, 2619–20, 101 L.Ed.2d 569 (1988). *Id.* at 757.

*Morrison* upheld the provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq.,* which allow for the appointment of an "independent counsel" to investigate and prosecute government officials for violations of federal criminal laws. The Act was attacked because it required the Attorney General to show "good cause" to remove an independent counsel. The Court found this provision constitutional:

> We see no constitutional problem in the fact that the Act provides for judicial review of the removal decision. § 596(a)(3). *The purpose of such review is to ensure that an independent counsel is removed only in accordance with the will of Congress as expressed in the Act. The possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority.*

*Morrison,* 487 U.S. at 693 n. 33, 108 S.Ct. at 2620 n. 33 (emphasis added).

■ *Morrison's* analysis is applicable here. Congress provided for judicial review of FCA dismissal motions to ensure that the executive enforces the FCA in accordance with the intent of Congress. Congress intended that FCA claims be dismissed for legitimate government purposes, and not as a result of fraud, illegality, or lack of political will. S.Rep. No. 345, 99th Cong., 2d Sess. 25–26 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 5266, 5291. Judicial review does not inject the court into the executive's decision to dismiss. Nor does it place an additional burden on the executive's exercise of prosecutorial discretion, because the constitution itself prohibits arbitrary or irrational prosecutorial decisions. *United States v. Redondo–Lemos,* 955 F.2d 1296, 1299–1300 (9th Cir.1992).

■ Although courts are reluctant to scrutinize prosecutorial charging decisions, which involve many practical considerations outside the purview of judicial review, review of a decision to dismiss an FCA case is limited to determining whether the government has a legitimate government interest that will be achieved by dismissal, which is not arbitrary or otherwise illegal. Historically courts have made such determinations of the lawfulness of executive function under a rational-basis standard. *See Reno v. Flores,* 507 U.S. 292, 301–06, 113 S.Ct. 1439, 1447–49, 123 L.Ed.2d 1 (1993) (applying rational basis review to substantive due process claim involving nonfundamental rights). The standard of review is deferential to preserve the traditional authority of the executive branch to make policy choices about the litigation it pursues. The court's limited review of the motion to dismiss does not permit the court "to infringe on prosecutorial authority to a degree beyond the bounds established by *Morrison*" and therefore does not violate the separation of powers. *Boeing,* 9 F.3d at 757.

### 2. Rational Relation Standard For FCA Dismissal

The motion to dismiss is based not only on the USDA's decision, but also the independent judgment of its litigation counsel, the DOJ. Although under the APA the court determines whether agency action is arbitrary or capricious by examining:

> whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... Although this inquiry into

the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); such an analysis does not directly apply to an agency's decision to institute, prosecute, and dismiss litigation. This is not APA review of agency action under 7 U.S.C. § 608c(15)(B), rather the motion tests the United States' decision to terminate FCA litigation, implemented by the DOJ.

■ The parties have argued, assumedly by analogy to the APA, that an agency decision is arbitrary if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hawaii Helicopter Operators Ass'n v. F.A.A.,* 51 F.3d 212, 214–15 (9th Cir.1995). However, if the agency examines the relevant facts and reaches a conclusion that is rationally supported by the facts then its decision is not arbitrary, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983), even if the decision is a "stupid" one, *Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1487 (9th Cir.) (Under APA review, "[s]o long as it explains its reasons, [an agency] may adopt a rule that all commentators think is stupid or unnecessary."), *cert. denied,* 506 U.S. 999, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). The extent of factual support required is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *United States v. Sunny Cove Citrus Ass'n,* 854 F.Supp. at 673 (quoting *Association of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed.Res.Sys.,* 745 F.2d 677, 683 (D.C.Cir.1984)). Dismissal of litigation by the executive branch is governed by different rules.

■ If dismissal serves a legitimate government purpose it is in the interests of justice, a ground long recognized in criminal law as supporting government dismissal of a case, except where the prosecutor's actions indicate a betrayal of the public interest. *United States v. Gonzalez,* 58 F.3d 459, 461–62 (9th Cir.1995). In analogous situations, courts have applied the "rational relationship" test to determine whether legislation is constitutional or executive action violates substantive due process. *See Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990); *Jackson Water Works, Inc. v. Public Utilities Comm'n,* 793 F.2d 1090, 1094 (9th Cir. 1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987).

■ "Application of the rational basis standard requires a two-step analysis." *Jackson Water Works,* 793 F.2d at 1094. First, the court must determine whether the challenged action has a legitimate purpose. *Id.* Second, there must be a reasonable fit between the governmental purpose and the agency action. *Reno v. Flores,* 507 U.S. 292, 303–05, 113 S.Ct. 1439, 1448–49, 123 L.Ed.2d 1 (1993). There need not be a "tight fitting relationship" between the two; it is enough that there are "plausible," or "arguable," reasons supporting the agency decision. *See Jackson Water Works,* 793 F.2d at 1094. The action need not be the best choice among competing alternatives, but merely a rational choice. *See Vermouth v. Corrothers,* 827 F.2d 599, 603 (9th Cir.1987). A two step analysis applies here to test the justification for dismissal: (1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose.

## B. The Government's Reasons For Dismissal.

■ In support of the motion Deputy Secretary Rominger submitted a declaration that in paragraph 11, stated:

The USDA based its decision on a desire to end divisiveness over the marketing orders, to terminate protracted and burdensome litigation, to protect the United States' taxpayers from continuing and escalating litigation expenses, to curtail the drain on private resources resulting from the litigation, and to allow the growers, agricultural cooperatives, handlers and

others to work together in shaping new marketing tools.

Rominger dec. ¶ 11.

### 1. Peace In The Industry.

The first interest identified, under the AMAA of 1937 and of 1947, is "a desire to end divisiveness over the marketing orders." The relators counter: neither Act is a legislative mandate that the USDA encourage cooperation in industries not regulated by marketing orders, and dismissal of these cases will not bring industry peace.

The AMAA seeks to achieve orderly market conditions and stabilize supplies and prices of agricultural commodities for the benefit of farmers and consumers. The principal mechanism to achieve these goals is the marketing order.[22] The success of marketing orders depends upon industry support for and compliance with the regulations. Clayton, at 199:1–13. In the words of the Supreme Court, the AMAA "contemplates a cooperative venture among the Secretary, handlers, and producers." *Block v. Community Nutr. Inst.*, 467 U.S. 340, 346, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). There is no requirement that any agricultural industry have a marketing order. Nonetheless, cooperation among industry participants is a purpose of the Act.

The AMAA does not specify that the Secretary must achieve cooperation, consensus, or peace in industries that do not have active marketing orders. The AMAA does not oblige the Secretary to mediate disputes in industries that have not chosen regulation, nor to make peace among competitors who do not wish to cooperate with each other. The government's interest is limited to facilitating cooperation and enforcing compliance with existing marketing orders so that the benefits of orderly marketing processes, stable markets, and higher prices, which the super-majority of the industry seek to achieve, are not thwarted by a minority of industry members who oppose regulation.

The government also argues that the Agricultural Marketing Act (AMA) of 1946, 7 U.S.C. § 1621, *et seq.*, creates an interest in

eliminating divisiveness in the industry. The AMA was enacted to improve marketing of agricultural products by encouraging:

> (1) continuous research to improve the marketing, handling, storage, processing, transportation, and distribution of agricultural products; (2) cooperation among Federal and State agencies, producers, industry organizations, and others in the development and effectuation of research and marketing programs to improve the distribution processes; (3) an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products. . . .

7 U.S.C. § 1621. Despite the AMA's reference to "cooperation", the Act does not direct the Secretary to achieve industry cooperation in the abstract. Rather, the statute directs the USDA to cooperate with other government agencies, industry participants and others in development of research and marketing programs to improve the distribution processes. No evidence was presented that the existence or nonexistence of the terminated marketing orders, prorate, or the existence of dissension or a lack of cooperation has had any deleterious effect on marketing programs, distribution processes, prices, handling, storage, processing, or transportation of fruit in the California–Arizona citrus industry. Ending divisiveness among industry participants to achieve peace is not a stated AMA goal. No witness identified any stated policy of the AMA of 1946, 7 U.S.C. § 1621, *et seq.*, as a ground for dismissal.

The evidence proved that dissension and a lack of cooperation in the citrus industry were caused by the adverse economic effects of the disputed marketing orders, particularly prorate. Rominger, at 202. The Secretary believed industry divisiveness was frustrating the purposes of the AMAA, Clayton, at 59, that there was a need to restore stability and cooperation to permit operation of a marketing order, which was needed to protect orderly markets in times of unusual weather or other adverse conditions. Rominger, at 219–220; Clayton, at 59.

The goal of achieving industry cooperation to permit the development of new marketing

---

**22.** Marketing orders require supermajority industry approval. 7 U.S.C. § 608c(a)(B). Defendants inferentially suggest that relators, by their strident opposition to prorate and relentless pursuit of litigation against Sunkist and its members, have been able to thwart the majority rule within the industry.

methods and to stabilize markets are legitimate concerns of the USDA, which may be incidentally advanced by dismissal of these cases. The evidence did not establish that dismissal of these cases will necessarily bring "peace" to the industry. To the contrary, adoption by dominant industry members of unfair regulations under the bloc voting provisions of the AMAA guarantee perpetuation of divisiveness and lack of cooperation. Industry cooperation to improve distribution processes, industry market stability, and increased prices are valid interests. That dismissal to achieve a "clean slate" may not achieve industry cooperation or peace does not prevent a finding that dismissal is reasonably related to achievement of these interests under the AMAA.

## 2. Facilitating A New Marketing Order.

A second alleged interest is achieving industry consensus for new citrus marketing orders. The relators argue the USDA has no authority to affirmatively build support for a new marketing order in industries that have not reached consensus favoring an order.

The government concedes the AMAA does not require the USDA to "take steps to institute new orders or to replace terminated orders with new ones." (Gov't brief, at 27:15–17). According to Dr. Clayton, "the way the 1937 Act works it is up to industry to approach the Department and seek authorization to use the tools available through Marketing Orders." Clayton, at 110:10–12. There are active marketing orders in less than half the fruit and vegetable industries authorized to establish marketing orders. Clayton, at 107. The USDA has not sought to achieve consensus around a marketing order in those unregulated industries. Clayton, at 107–10. Although AMAA regulations

authorize the USDA to propose marketing orders, 7 C.F.R. § 900.3, the USDA generally waits for industry participants to propose an order. It cannot impose orders that are not supported by the industry.

The government suggests it has greater responsibility to perpetuate marketing orders in the citrus industry, based on forty years of regulation under orders 907, 908, and 910. Dr. Clayton characterized the USDA as a "partner" with the industry that had "some ownership" of the lack of consensus for a new marketing order. Clayton, at 110–11. However, the USDA has made no efforts to establish new orders in approximately ten other industries in which AMAA marketing orders were terminated in recent years. Clayton, at 111. Termination of the citrus orders was said to be unique, because unlike the other industries, in which there was consensus marketing orders were not needed, many members of the citrus industry indicated support for a new marketing order.[23] The USDA terminated the citrus marketing orders to send a message to the citrus industry and others that widespread intentional violations of a marketing order will result in the order's termination. Rominger, at 202:8–19.

NOAC and VOAC reports show considerable efforts toward amending the orders that bogged down over concerns about this litigation. These committees went so far as to request the USDA's help in developing new marketing orders. Ex. G–69. Although there was no consensus, many different segments of the industry preferred amending the existing orders or creating a new marketing order to having no orders. For example, Growers for Modern Marketing, a group opposed to prorate, stated that it believed "a new marketing order is essential." Ex. G–57, at 5; *see also* R–225, R–250. The USDA also referenced the 1991 referendum to continue the orders.[24] Rominger, at 272–73.

**23.** One possible explanation for the apparent absence of industry consensus for termination of the citrus marketing orders is that those who were privately unwilling to abide by prorate had great incentives to support it publicly. Prorate cheaters received higher prices for their fruit and increased market share at the expense of their law-abiding competitors. Clayton, at 120–21.

**24.** The results of the 1991 referendum, in which 91% of the producers voted to continue the orders, may not have accurately reflected the ex-

tent of the industry's support for the marketing orders due to Sunkist's bloc vote in favor of the orders. The partial results from a straw poll conducted by Sunkist prior to the 1991 referendum showed that 64 growers marketing 2,881,-146 field boxes of navel oranges favored continuation of the orders, while 63 growers marketing 1,883,757 field boxes opposed continuation of the orders. Ex. R–19, at 4. These results reflected the ballots of approximately 5% of Sunkist's member growers.

Under USDA regulations the Secretary can propose a marketing order for listed commodities. 7 C.F.R. § 900.3. However, neither the AMAA nor the regulations specifically address whether the USDA may take actions to encourage an industry to approve a marketing order, once an order is proposed.

The USDA interprets its mandate under the AMAA to include facilitating the approval of marketing orders in industries that support the adoption of an order. When industry members propose an order, the USDA provides information and assistance. Golden, at 639:7–14. USDA officials work to foster the development of marketing orders when they believe an order will promote the policies of the AMAA. The government argues that encouraging consensus for a new beneficial marketing order is a legitimate interest under the USDA.

 The government claims this interpretation of the AMAA is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress had directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statue is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781. "[A]n agency's interpretation of its own organic statute and regulations are accorded deference, 'unless the administrative construction is clearly contrary to the plain and sensible meaning of the regulation.'" *Borregard v. National Transp. Safety Bd.*, 46 F.3d 944, 945 (9th Cir.1995) (quoting *Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir.1976)).

The AMAA does not specifically address whether the USDA can promote the development of new marketing orders by resolving disputes that prevent an industry from reaching consensus. However, the USDA's interpretation, that the AMAA permits the USDA to resolve industry disputes and foster consensus for a new marketing order, when industry interest for a new order appears, is reasonable and not contrary to the plain meaning of the statute.

The evidence established that substantial sentiment was expressed to the USDA, through NOAC and VOAC meetings, the Dooley meetings and independent industry members, for development of new orders. Relators counter that there is no desire or need for new orders. Even if the USDA's perception that the industry seeks new orders is mistaken, it was proved the view is not held in bad faith. After the 1993 suspension of prorate and the 1994 termination of the marketing orders, the citrus industry has shown no signs of disorderly or unstable markets. Rominger, at 220. This does not mean new orders are unnecessary. Marketing orders in part are to assure stable markets and prices when weather, supply interruptions, or other market disrupting forces occur. Rominger, at 219–20.

USDA-perceived industry sentiment for a new marketing order is a valid government interest under the AMAA which the USDA can act to facilitate. That dismissal of the cases will not assure the adoption of new orders does not make dismissal irrational.

### 3. Financial Impact On Industry Participants.

A third interest is "to terminate protracted and burdensome litigation, ... [and] to curtail the drain on private resources resulting from the litigation." Dismissal is said to be necessary to protect economic viability of the citrus industry. The government argues the continuing cost of litigating these cases and the potential for massive damage awards threatens to bankrupt the defendant packinghouses.

Protecting the financial health of the agriculture industry is a cornerstone of AMAA policy. The Act declares: "disruption of the orderly exchange of commodities in interstate commerce impairs the purchasing power of farmers and destroys the value of agricultural assets which support the national credit structure and that these conditions affect transactions in agricultural commodities with a national public interest." 7 U.S.C. § 601. Congress has decided that the protection of farmers' purchasing power and preservation of agricultural assets is in the national public interest. Protecting citrus handlers from financial ruin is a legitimate government interest.[25]

At the evidentiary hearing the packinghouse defendants presented expert testimony showing their inability to satisfy the potential damage awards in these cases. The evidence showed that most, if not all, of the twelve packinghouses, anonymously analyzed, would be bankrupted by the maximum possible penalties under the FCA. The average penalty under the FCA is seventeen times greater than under the AMAA. Sexton at 433. The destructive potential of these cases was convincingly established.[26] The government also argues that the expense to the taxpayers and the defendants of litigating these cases justifies dismissal. However, no evidence quantifying litigation costs incurred by the government and the defendants, nor the effect of litigation costs on any defendant's financial condition was proffered.

The relators point to Deputy Secretary Rominger's testimony that protecting the economic viability of the defendants was not "determinative," Rominger, at 265, to support their contention that adverse economic impact was not a reason for dismissal. The USDA did not then have before it the financial evidence adduced at the evidentiary hearing. Policy makers within the USDA were informed by staff that the FCA cases could bankrupt some packinghouses. Rominger at 203, 264–65. The Secretary's counsel stated the economic effect on the industry and the defendants was considered in the dismissal analysis. Schnoor dep. at 21:1–8.

The packinghouse defendants contend the government had evidence of potential financial harm through information furnished in the settlement process and communications about the financial condition of at least one packinghouse defendant. Ex. R–204. APA review of agency action under the arbitrary and capricious standard does not permit an agency to justify its actions by advancing post hoc rationalizations or to rely on evidence not presented during the adjudicatory or rulemaking process. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Louisiana–Pacific Corp. v. Block,* 694 F.2d 1205, 1210 (9th Cir.1982). This APA standard of review is not applicable to the United States' decision to dismiss FCA cases. The validity of the decision to dismiss is determined by the reasons and evidence presented to the court in support of and opposition to the motion. Review is not limited to the reasons or evidence relied upon by the agency at the time it arrived at the decision to move for dismissal.

A principal purpose of the AMAA is to ensure the economic vitality of the agricul-

---

**25.** It could be argued that Congress primarily intended the AMAA to protect agricultural producers, not handlers. For example, the Act is intended to assure parity prices for farmers (not packinghouses), 7 U.S.C. § 602(1), and a marketing order can become effective without handler support if it has sufficient support from farmers and the Secretary makes certain findings. 7 U.S.C. 608c(9). Nevertheless, the declared policy of protecting "agricultural assets" is broad enough to encompass the assets of those who market agricultural products, the handlers, as well as those who produce them. 7 U.S.C. § 601. Moreover, financial destruction of handlers would necessarily harm the economic interest of farmers who utilize handlers' services to process and market fruit.

**26.** Dr. Carman's testimony as to the extent of the impact on county-wide employment and personal income from judgments against the packinghouse defendants was less convincing. The economic model he used was not developed to measure the impact on a community of a judgment against a single business entity. Rather, it was designed to model the consequences of diffuse infusions or withdrawals of capital, such as taxes. Carman, at 496–97. Dr. Carman was unaware of any instances in practice or in economic literature in which the model was used for this purpose. Carman, at 497.

ture industry. The USDA determined that the burden of this protracted litigation and the potentially enormous penalties that could result, threatened to destroy part of the citrus industry. Dismissing these FCA cases is a rational means of advancing the legitimate government interest under the AMAA to protect the purchasing power of farmers, agricultural assets, and the national credit structure in the statutorily defined national public interest.

### 4. Conservation Of Government Resources.

The government can legitimately consider the burden imposed on the taxpayers by its policies. Here, the government concluded that expenditure of the extensive resources required to continue prosecution and defense of all prorate violation cases was disproportionate to the benefits obtainable. To continue the AMAA enforcement actions, the government would have to bear the expense of hearings on the 1984 marketing orders plus the cost of the AMAA litigation and any litigation challenging the validity of the marketing orders. In light of the divisiveness over the citrus marketing orders, USDA concluded the costs of continued litigation of AMAA and FCA cases outweighed benefits of curing the procedural deficiencies in the 1984 orange marketing orders and any economic recovery under the FCA.

Relators argue the government should continue to prosecute violators under FCA cases because: (1) FCA claims based on prorate violations are not affected by invalidity of the underlying marketing orders, *See United States v. Kapp,* 302 U.S. 214, 216–18, 58 S.Ct. 182, 183–84, 82 L.Ed. 205 (1937) (upholding validity of criminal prosecution under former False Claims Act for misrepresentation in transaction governed by Agricultural Adjustment Act (AAA) after the AAA was found void); and (2) the government can allow the relator to bear the expense of the litigation at no cost to the United States. The government believes FCA claims cannot be asserted under the AMAA; and wishes to preserve its right to challenge subject matter jurisdiction on appeal. Rominger, at 212–13. It seeks to remain in control of the FCA litigation based on its belief relators do not adequately represent the United States' interests due to their

long history of hostility to federal regulation under the AMAA, extended acrimonious litigation against the government and industry competitors, and their goal of maximizing the amount of monetary recovery against defendants.

USDA also argues continued internal staff costs incurred in these FCA cases are enormous, although unquantified. Concerns about the burden on government resources are valid, even if relators assumed all of the expense of prosecuting the FCA cases.

### 5. Equity Within The Industry.

Equitable treatment of all handlers who cheated is a separate interest. The government points out that if the FCA cases proceed, primarily Sunkist and some of its affiliated packinghouses will be held accountable for prorate violations, while the rest of the industry will receive amnesty. It contends this is unfair to the FCA defendants, particularly since potential liability under the FCA greatly exceeds damages and penalties that could be assessed under the AMAA. Relators do not deny that the executive is vested with the power to grant amnesty to law violators.

■ The Fifth Amendment precludes the government from employing classifications that are "wholly without any rational basis." *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 538, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973). The government does not claim it is compelled by the constitutional principle of equal protection to dismiss the FCA cases. Rather, it asserts a legitimate government interest in treating similarly-situated prorate cheaters equally. *See, e.g., Morici Corp. v. United States,* 500 F.Supp. 714, 723 (C.D.Cal.1980), *rev'd on other grounds,* 681 F.2d 645 (9th Cir.1982). The AMAA forfeiture cases and these FCA cases are aimed at punishing the same type of wrongful conduct: shipping fruit in excess of prorate and failing to accurately report and pay assessments for unreported shipments. Since the AMAA cases have been dismissed, if the FCA cases are prosecuted one group of cheaters, composed almost entirely of Sunkist affiliated packinghouses, will be punished while all other prorate violators will go

unpunished. The evidence established cheating was widespread in the industry: Sunkist, Dole, Central California Orange Growers, numerous independents, Sequoia, Sunny Cove, Eco Farms, Suntreat, and Cecelia Packing have been identified. Lewis, at 306–312.

Relators counter that dismissal is inequitable because it allows packinghouses that cheated to keep their "ill-gotten gains." However, FCA recovery will not compensate innocent packinghouses for profits or market share lost to prorate violations. Any FCA recovery will only benefit Sequoia (an alleged wrongdoer), its counsel, and the United States Treasury. FCA penalties are completely unrelated to the economic harm caused to innocent handlers by prorate cheaters. Unlike antitrust and unfair competition laws, the FCA is not designed for use by private entities to deter anticompetitive conduct or to compensate resulting losses. Dismissal of these FCA cases has no direct economic impact on innocent handlers.[27] Dismissal of the FCA cases will further the government's interest in equal treatment for all prorate cheaters by making its policy of amnesty universal. The government also believes that its dismissal of Sequoia from an AMAA enforcement case the government valued at three million dollars militates in favor of dismissal. The government's "equal treatment of violators" objective is a valid purpose that will be furthered by dismissal.

The government has articulated legitimate reasons for dismissal of these cases, which will be served by dismissal; the burden shifts to relators to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal.

## C. Relators' Objections.

### 1. Dismissal Is Not Fraudulent.

■■■ Relators argue the government has committed fraud on the court, perpetrated by three categories of false representations made by government trial counsel to the court.

■■■ The first alleged misrepresentation is the government's statement at the August 1993 hearing on its motion to intervene that it would litigate the FCA claims against the defendants if settlement efforts were unsuccessful.[28] (Aug. 9, 1993, Trans. at pp. 22–24). Relators claim the government misled the court about its true intent for intervening, because two USDA officials testified the government's sole purpose for intervening was to negotiate a global settlement, See Rominger, at 214, 261; Golden, at 634; although both these witnesses testified USDA policymakers had not discussed what they would do if the efforts at settlement failed. Rominger, at 261–62; Golden, at 634.

The statements of the government's counsel appear to be inconsistent with the USDA's intent in entering the cases. The DOJ, not the USDA, has ultimate responsibility for prosecution of FCA cases. It is unclear whether the government's trial counsel knew the USDA, which in retrospect states it never had the intent to prosecute these FCA claims to conclusion, was so informed when he represented to the Court the United States would prosecute the FCA claims if necessary. The absence of evidence whether the DOJ was fully advised by its client, USDA in August 1993, that USDA would in no event try the FCA cases to conclusion prevents a finding that the government's trial counsel misrepresented the

---

**27.** The only possible benefit to innocent handlers from prosecution of the FCA cases is the potential that some of their competitors will be bankrupted by this litigation.

**28.** The relators have also argued that the government is judicially estopped from dismissing these FCA cases based upon representations made in connection with the motion to intervene. This argument was rejected in the prior Memorandum Opinion, at 10–12. Judicial estoppel bars a party from manipulating the judicial process by asserting inconsistent legal positions in the same

litigation. See Morris v. California, 966 F.2d 448, 452 (9th Cir.1991), cert. denied, —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). The statement of the government's trial counsel, made during oral argument on the motion to intervene, that the government intended to prosecute the FCA cases was not an unalterable legal position. The government's change in policy toward the FCA cases was the result of changed circumstances in the industry. Judicial estoppel is an equitable doctrine. Id. Equity is not served by compelling the government to prosecute a case that undermines legitimate government interests.

then existing intent of the USDA or the DOJ. As case manager, the DOJ's intent about prosecuting these FCA cases may have differed from the USDA's.

Assuming, *arguendo*, that the government's representation that it would litigate the FCA cases was false, the intervention order could have been rescinded to remove the government as plaintiff in the case. The government still had the ability to reintervene for the purpose of bringing this motion to dismiss. Good cause [29] for reintervention could be established upon a showing of changed circumstances, to justify the government's exercise of its statutory authority to dismiss. The DOJ's failure to reach a global settlement, the industry's inability to form consensus on new marketing orders, and the announcement of the *Sunny Cove* decision prompted the USDA to reconsider its prosecution of violations of the 1984 citrus marketing orders. Clayton, at 132–34, 138–44, 186–87. Even if the government's prior intervention was premised on a misrepresentation, independent grounds existed for reintervention.

The second alleged misrepresentation concerns jurisdiction. When these cases were first filed, the government unsuccessfully argued that subject matter jurisdiction did not exist under the FCA. Relators claim the government subsequently acquiesced to subject matter jurisdiction by: (1) filing the November 3, 1993, *amicus* brief in the *Stark Packing* case, No. CV–F–89–058; (2) filing the third amended complaint asserting FCA claims in the *Magnolia* case; and (3) representing on August 9, 1993, that it would try the FCA cases if necessary.[30] Whether the government acquiesced in subject matter jurisdiction is irrelevant for the purposes of this motion. The government seeks to dismiss these cases for the reasons stated in its motion, not for absence of jurisdiction based on a lack of substantive merit of the FCA claims.

Finally, the relators argue the government deceived the court about the status of the global settlement and deliberately delayed making settlement submissions to impede the progress of the cases and inferentially to provide time for a political solution. The evidence does not disclose fraud by the government concerning the global settlement negotiations. The evidence proved the government made substantial good faith efforts to settle all cases over an extended time period. The government claims it did not submit any proposed settlements to the court for approval within the time established by the September 9, 1993, Settlement Procedures Order because it did not receive acceptable settlement offers. The government updated the Court with accurate settlement status reports on November 8, 1993, and January 28, 1994. No party could reasonably have anticipated the April 1994, *Sunny Cove* decision. There is no evidence that the government wrongfully delayed or did anything but utilize its best efforts to induce settlements of all outstanding AMAA and FCA cases.

No other evidence of fraud was adduced. Although the apparent inaccuracy of DOJ's trial counsel's statements to the court about continued prosecution of the FCA cases is disturbing, relators did not depose AUSA Bensing or otherwise offer evidence of what information had been provided to him by the USDA regarding future prosecution of the FCA claims at the time he made such statements to the Court. The USDA position on the litigation has changed over time from active AMAA enforcement, to global settlement, to industry-wide dismissal. The government does not stand to gain from any alleged fraud. Nor is there any evidence that packinghouse defendants procured the intervention of the United States by wrongful means for the sole purpose of dismissing the cases. No fraud to procure dismissal of the FCA cases has been proved.

---

**29.** The FCA provides that the government may intervene in a FCA case "upon a showing of good cause." 31 U.S.C. § 3730(c)(3); *see United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 753 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994). No limit is placed on the circumstances or the number of intervention motions that the government may bring.

**30.** In each case the government explicitly reserved its right to challenge subject matter jurisdiction on appeal. The anomaly of when or in what context such an appeal might be taken, in view of the undertaking of DOJ trial counsel to prosecute the FCA claims to recovery, has not been explained.

### 2. Improper Or Undue Influence.

Dismissal must not be the product of improper or undue influence on government officials. However, citizens are entitled to petition the government for redress of grievances by advocating the passage or enforcement of laws. *See Eastern R.R. President's Conf. v. Noerr Motor Freight*, 365 U.S. 127, 135–38, 81 S.Ct. 523, 528–30, 5 L.Ed.2d 464 (1961) (Sherman Act does not apply to "mere solicitation of governmental action with respect to the passage and enforcement of laws").

▮ Members of Congress may seek to influence agency action. *See Radio Ass'n on Defending Airwave Rights, Inc. v. United States Dept. of Transp.*, 47 F.3d 794, 807 (6th Cir.1995), *petition for cert. filed* 63 U.S.L.W. 3849 (May 18, 1995). Congressional influence is improper only if the agency is asked to consider factors not relevant to the decision and the agency's determination is affected by the extraneous considerations. *Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C.Cir.1981); *Fallini v. Hodel*, 725 F.Supp. 1113, 1118 (D.Nev.1989), *aff'd* 963 F.2d 275 (9th Cir.1992). "Americans rightly expect their elected representatives to voice their grievances and preferences concerning the administration of our laws … it [is] entirely proper for Congressional representatives vigorously to represent the interests of their constituents before administrative agencies engaged in informal, general policy rulemaking." *Sierra Club*, 657 F.2d at 409.

▮ Relators claim that improper pressure and undue influence from the defendants and members of Congress tainted the USDA's decision to seek dismissal of the FCA cases. Defendants strenuously campaigned for dismissal of the FCA cases after the May 16, 1994 announcement it would terminate marketing orders, dismiss the AMAA cases, and withdraw from the FCA cases. Defendants believed it was unfair not to also dismiss the FCA cases. They exercised their right to petition the government by letters, phone calls, and personal visits to USDA officials, the DOJ, and members of Congress. There is no evidence that the defendants engaged in bribery, fraud, coercion, or a conspiracy with government officials to violate the law. *Cf. California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 512–15, 92 S.Ct. 609, 611, 612–14, 30 L.Ed.2d 642 (1972) (antitrust immunity for lobbying activities not applicable to bribery, fraud, or conspiracy to harm a competitor). The frequency and manner of defendants' contacts with government officials prior to the USDA's decision to seek dismissal of the FCA cases give the appearance that defendants had unique access, but do not of themselves establish improper influence.

Nor did Congressional contacts with the USDA and the DOJ constitute undue influence. The evidence shows the contacts among members of Congress, the USDA and the DOJ concerned subject matter that could properly be discussed. For example, Senator Dennis DeConcini wrote in a letter to the DOJ that dismissal "would be consistent with the actions of the Department of Agriculture and indeed give the citrus industry a fresh start." Ex. G–26. Representative Elton Gallegly stated his support for the USDA's policy "objective of ending the divisive and costly litigation which has afflicted the citrus industry for over a decade." Ex. G–27. Senator Diane Feinstein requested that the DOJ "consider" the USDA's request for dismissal. Ex. G–28.

None of the Congressional contacts threatened to take action adverse to the USDA or the DOJ. *See D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246–47 (D.C.Cir.1971), *cert denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). In *D.C. Federation* Representative Natcher publicly stated that unless the Secretary of Transportation approved a proposed bridge, money earmarked for the construction of the District of Columbia's subway system would be withheld. There were no threats to hold USDA or DOJ funding "hostage," nor were any other retributive consequences mentioned.

The cases cited by the relators are distinguishable. In *S.E.C. v. Wheeling–Pittsburgh Steel Corp.*, 648 F.2d 118, 125–28 (3rd Cir. 1981), the court found it an abuse of process for an agency to issue a subpoena based upon improper congressional pressure and without an objective determination by the agency. Here, there is no evidence of improper pres-

sure or that the USDA and DOJ failed to make independent determinations that dismissal was justified. In *Pillsbury Co. v. F.T.C.*, 354 F.2d 952 (5th Cir.1966), the court found intense questioning by a Senate subcommittee of FTC officials about a case pending before the agency created an appearance of partiality and deprived the corporation involved of due process. Relators and their allies exerted vigorous pressure on the USDA, DOJ, and Congress persons, advocating that the cases not be dismissed. No evidence establishes that the conduct of any legislator crossed the line of fair advocacy.

This case is analogous to *Sierra Club v. Costle*, in which Senator Byrd met with officials from the Environmental Protection Agency to "express 'strongly'" his view that proposed regulations would adversely affect his constituents. 657 F.2d 298, 408 (D.C.Cir. 1981). There, the only evidence of extraneous pressure was a newspaper article stating that Senator Byrd "hint[ed]" that the President needed his support on other matters pending before Congress. *Id.* at n. 539. The D.C. Circuit found such evidence too insubstantial to warrant a finding of unlawful congressional interference. *Id.*

Relators proffer letters from Sunkist Vice-President William K. Quarles thanking several members of Congress for "the major successful effort . . . made to influence the DOJ to file the motions to dismiss the [FCA] cases." Ex. R–167. Mr. Quarles was aware of letters and phone conversations between members of Congress and the USDA and DOJ, but he did not know the content of those communications.[31] Quarles, at 676–79. Since Quarles did not know the substance of the Congressional contacts, it cannot reasonably be inferred from his reference in the letter to the term "influence," that any member of Congress applied undue or improper pressure. The officials who actually spoke with members of Congress testified that there was no Congressional use of undue influence. Rominger, at 210.

Relators implicitly suggest the government's decision was motivated by improper influence because Sunkist, and the law firm representing the packinghouse defendants, Baker Manock & Jensen, made contributions to the political campaigns of Democratic members of Congress totalling $170,000 over the last 15 years. However, relators do not argue that the political contributions were illegal. Contributing to political campaigns is protected by the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 58, 96 S.Ct. 612, 653, 46 L.Ed.2d 659 (1976). That some of the defendants and their counsel have made political contributions does not amount to undue or improper influence. No link between any contribution and the requested dismissal was established.

The relators have failed to show that the decision to seek dismissal resulted from improper influence or illegal pressure.

**3. Dismissal Is Not Arbitrary Or Capricious.**

Relators raise several arguments in support of their claim the government's decision to dismiss is arbitrary. None of these arguments are persuasive. Relators contend the government acted arbitrarily by failing to consider reasonable alternatives; i.e., the government should have chosen one of two "less draconian" alternatives to dismissal: (1) cure the *Sunny Cove* procedural deficiencies in the 1984 marketing orders; or (2) amend the AMAA cases to state FCA claims.[32]

The USDA considered the first alternative but rejected it for two reasons: (1) it believed it could not properly address a tendency finding made 10 years ago, and (2) it was concerned that an attempt to address the negative tendency finding would spawn even more litigation. Clayton, at 77–78; Rominger, at 199–200. Nor can relators force the USDA to undertake a quasi-rulemaking proceeding to reverse the 1984 tendency finding.

---

**31.** In fact, Mr. Quarles testified that he did not know whether several of the Senators or Representatives that he thanked actually contacted the DOJ. Quarles, at 676–79. He stated that he thanked everybody who "may have been interested" because "politicians love to be thanked." Quarles, at 679:23–25.

**32.** Relators and the government agree that FCA claims premised on AMAA violations survive even if the underlying marketing orders are invalid.

*E.g., American Horse Protection Ass'n. v. Lyng,* 812 F.2d 1, 7 (D.C.Cir.1987).

The USDA also declined the second alternative, amending its AMAA cases to state FCA claims, because the DOJ contends the FCA does not apply. Rominger, at 201, 212–13. FCA penalties sought by relators were excessive and not related to the amounts gained by violators which were the amounts of penalties sought by USDA under the AMAA.[33] The government is not required to choose the best or least intrusive alternative, so long as its decision is rational. *Vermouth v. Corrothers,* 827 F.2d 599, 603 (9th Cir. 1987). Although the government rejected alternatives that relators prefer, its grounds for dismissal are legitimate, which is sufficient.

■■■■ Relators claim the USDA has arbitrarily abandoned its policy of strictly enforcing prorate. USDA in the past undertook to fully investigate and prosecute AMAA violations through operation Fair Enforcement. *See* Exs. R–22, R–27, R–45. Relators say it is capricious for the government to reverse its enforcement policy and pursue amnesty for all prorate cheaters. However, when the circumstances change, the government is free to change its policies concerning the management and prosecution of its own litigation and implementation and enforcement of laws and regulations it administers. The decision to grant amnesty is a political one related to farm policy. U.S. Const. Art. II, § 2. An agency's decision not to prosecute or enforce, by criminal or civil means, is a decision generally committed to an agency's absolute discretion. *Heckler v. Chaney,* 470 U.S. 821, 829–30, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). One remedy for relators and others who disagree with the executive's political decision, and the legislators who supported it, is to exercise their electoral franchise.

■■■■ Here, the government changed its policy in response to the *Sunny Cove* decision, its failed attempts to settle the FCA and AMAA cases, and a perceived inability to cure unlawful marketing orders. It decided that general amnesty was preferable to prosecution under the FCA, which threatened to bankrupt part of the industry through the imposition of penalties greatly in excess of relief obtainable under the AMAA. Although the government changed its policy, it did so on the basis of rational government interests. Under the standard of review for dismissal of FCA cases, as well as decision-making under the APA, the government does not act arbitrarily when it provides a reasoned explanation for its change of policy. *See Association of Data Processing v. Board of Governors,* 745 F.2d 677, 683 (D.C.Cir. 1984) (agency action arbitrary and capricious when "it is an abrupt and *unexplained* departure from agency precedent") (emphasis added). Here, the decision was made only after input to the USDA and DOJ from all concerned.

Relators argue no new facts were presented to the USDA between May 16, 1994, when it announced its decision to withdraw from the FCA cases, and May 20, 1994, when the USDA asked the DOJ to consider dismissing the FCA cases. Relators claim USDA's request on May 20 was a "reversal" of its previous policy to withdraw from the FCA cases and allow the relators to proceed.

Deputy Secretary Rominger testified that the USDA would have sought dismissal of the FCA cases on May 16, had it been aware of the government's right to do so under § 3730(c)(2)(A). Rominger, at 206:10–14, 239:14–18. He stated that the USDA's intent on May 16, 1994, was "to dismiss all of the litigation that [the USDA] possibly could." Rominger, at 206:13–14. When the USDA became aware of the possibility that § 3730(c)(2)(A) authorized dismissal of the FCA cases, it promptly requested that the DOJ consider dismissing these cases, since dismissal would further the USDA's stated objectives in the May 16, 1994, announcement. Golden, at 659:1–6.

Relators have not demonstrated that the government's reasons underlying the motion to dismiss are arbitrary or capricious.

---

**33.** Congress eliminated a treble damages provision of the Agricultural Act of 1961. S.Rep. No. 566, 87th Cong. (1st Sess. (1961)), *reprinted in* 1961 U.S.C.C.A. No. 2243. No AMAA treble damages penalty has since been enacted.

### 4. Improper Considerations Of Relators' Status.

 Relators claim dismissal was based on the following improper factors pertaining to their "status": (1) that they are competitors of the defendants; (2) that Sequoia has challenged the regulations they now seek to enforce; (3) that Sequoia is trying to destroy Sunkist; (4) that Sequoia is an alleged violator of prorate; (5) that relators are trying to obtain a competitive advantage over defendants.

Relators have not met their burden of showing that these factors actually motivated the government's decision to dismiss. The only evidence that any of such factors were considered by the government is a letter from Assistant Attorney General Hunger responding to three members of Congress who wrote the DOJ to express their support for dismissal of the FCA cases. The letter stated:

> If granted, we hope the Motion to Dismiss, made at the urging of the Department of Agriculture, and supported by an affidavit of the Deputy Secretary of Agriculture, will effectuate USDA policy, ensure fairness in DOJ's enforcement proceedings, and end the anomalous situation whereby one member of an industry is obtaining a competitive advantage by selectively enforcing regulations (which the company itself has challenged) against certain competitors.

See Exs. G–46, G–47, G–48. The letter describes "an anomalous situation" not that the decision was based on such factors. Government officials who testified at the evidentiary hearing denied that Sequoia's status as an industry competitor or alleged prorate cheater was a basis for dismissal. See Clayton, at 105–06; Rominger, at 241–42.

 When deciding whether to intervene in or dismiss an FCA case, the government may properly consider factors bearing upon the relators' suitability or incentive to prosecute the case. Such factors may involve status as it relates to motivation and competence to sue under the FCA. For example, as competitors of the defendants, relators have an incentive to seek damages and maximum penalties that could bankrupt defendants and provide relators an advantage by eliminating competing industry members. This could lead relators to prosecute the cases in a manner inconsistent with the government's interest under the AMAA to preserve the economic integrity of the citrus industry. There was evidence that Sequoia challenged the AMAA regulations under which it was sued by the government. There was evidence that a Sequoia principal, Mr. Pescosolido, admitted Sequoia engaged in prorate cheating. Evans dep. at 48–50. Consideration of the relators' motives is not inappropriate. There is no evidence that improper status considerations motivated the decision to dismiss.

### 5. Dismissal Of The Lemon Cases Is Not Irrational.

 Relators assert, first, the lemon order did not suffer from the legal deficiencies identified in the *Sunny Cove* decision, no negative tendency finding had to be reversed to preserve the lemon order's validity. Second, the lemon industry did not demonstrate the degree of divisiveness existing in the navel and valencia orange industries, although there were some handlers, such as Sequoia, who voiced opposition to the use of prorate for lemons. Clayton, at 147–48; Rominger, at 270–71. Third, the USDA did not solicit amendments to the lemon order.

Although only four FCA cases were pending in the lemon industry at the time DOJ sought dismissal, the USDA was investigating other lemon handlers for prorate violations and officials perceived lemons and oranges were on "equal footing" because lemon prorate violations were comparable to prorate cheating in oranges and potentially as pervasive. Clayton, at 146–147, Golden, at 652–654, Lewis, at 316. To preserve the financial stability of the lemon industry, the USDA rationally believed, for the same reasons it sought to dismiss the orange cases, that it was necessary to dismiss the lemon cases. This decision is supported by substantial evidence.

### III. CONCLUSION

These FCA cases arise from a chapter of federal farm policy history of which no one

can be proud. The USDA permitted adoption and continuation of restrictive flow to market rules that were advocated by a dominant citrus cooperative (Sunkist), and its supporters, which caused industry-wide cheating and law violations. Unbridled economic self-interest drove citrus industry members to ignore and violate with impunity regulations they caused to be enacted. These extremes of lawless conduct culminated in a chaotic regulatory environment in which law-breakers profited while law-abiding industry members lost profits and market share. In response the USDA first instituted AMAA enforcement, then suspended prorate, and sought global settlements. After failed settlement efforts and invalidation of the orange marketing orders, USDA terminated all the disputed marketing orders, dismissed all AMAA enforcement litigation, and now seeks to dismiss all FCA cases to "wipe the slate clean." Although relators view this as a loss of political will, the United States has advanced legitimate government interests to justify its decision.

Ultimately the decision on this motion is compelled under the Constitutional doctrine of separation of powers, which precludes the judiciary from interfering with political choices made by the Executive in the exercise of prosecutorial discretion. The FCA does not give relators the power to dictate federal government policy in the area of agricultural regulation or to decide whether amnesty for fraud on the government should be withheld. Those discretionary political decisions reside with the Executive, in discharge of its duties under the AMAA, as authorized by the legislature. Nor does the FCA authorize the judiciary to substitute the court's judgment for that of the Executive Branch, as to what is in the best interests of the citrus industry or the United States Treasury. It is the Executive Branch which is vested with constitutional authority to execute and enforce the law. U.S. Const., Art. II, § 3.

In addressing these motions, the Court's function is limited to determining whether the decision to dismiss these FCA cases is based upon one or more legitimate government interests which will be advanced by dismissal, is not arbitrary and capricious, fraudulent, or illegal. The ultimate choice to forego prosecution of the law breakers is political, vested in the Executive Branch, which possesses the power to grant amnesty.

The Executive has decided continued prosecution of these cases will perpetuate industry divisiveness, inhibit the AMAA regulatory environment in the Arizona–California citrus industry, prevent industry cooperation to achieve orderly markets, impede the development of distribution processes, destroy the economic health of part of the industry, bankrupt members, and thereby damage the national economic interest. USDA reached the judgment that amnesty serves to facilitate adoption of new marketing orders, conserve industry and government resources, and achieve equity among all industry law violators. USDA and DOJ determined all these interests outweigh the benefits of a potential recovery for the federal treasury and the *in terrorem* effect of vigorous law enforcement under the AMAA. Dismissal is rationally related to accomplishment of these legitimate government interests. The DOJ independently exercised its discretion to determine that these FCA cases do not serve the public interest.

Potential consequences of dismissal are a loss of public confidence in the government's fair and even-handed enforcement of the law and precedent that could weaken the incentive of relators to pursue FCA cases. Neither consequence is ineluctably compelled. It is unlikely that the unique circumstances underlying these cases will reoccur and the risk of deterring future *qui tam* cases is minimal. If such conditions arise again, correction of the problem lies with Congress and the Executive.

Relators complain that they cannot match Sunkist's political access, tax and antitrust immune status, and bloc voting power granted by law. Congress has vested agricultural co-operative corporations with unique advantages to advance the economic well-being of agricultural industries and their members. Where, as here, the protected entity utilizes its strength to facilitate passage of rules which harm rather than help an industry, resulting in industry-wide cheating and law-breaking, the Executive may act, and has done so, to terminate the regulations to send

a message that unfair or unworkable rules will not be perpetuated. If co-ops are disserving the public interest, the legislature may reexamine the wisdom of the underlying statutory scheme that grants co-ops special powers.

Once the dismissal of these FCA cases is determined, as it has been, to be for valid governmental purposes, which are not arbitrary and capricious, not the product of fraud or improper political influence, the Court's power to deny the dismissal motion is exhausted and deference to the Executive's decision required. What the court thinks of the merits of the decision to dismiss these cases, right or wrong, whether law breakers should be held accountable; whether the reasons advanced are persuasive, or the ultimate consequences fair or unfair, matters not, for the court lacks the power to substitute its judgment for that of the Executive.

The motion to dismiss all these pending FCA cases is GRANTED, with prejudice. In the exercise of the court's discretion, in view of the novelty and difficulty of the issues presented, each party shall bear its own costs and attorneys fees. The United States shall prepare a judgment of dismissal in conformity with this opinion and lodge it with the court within five (5) days following the date of service of this opinion.

SO ORDERED.